**UNITED STATES of America, Appellee,**

v.

**Tommy L. BUTLER et al., Appellants.**

Nos. 73–1359, 73–1360, 73–1362 and 73–1363.

United States Court of Appeals,
Tenth Circuit.

Submitted Jan. 7, 1974.

Decided April 4, 1974.

Rehearing Denied May 31, 1974.

Arthur S. Bay, of Bay, Hamilton, Renegar & Lees, Oklahoma City, Okl., for appellant, Tommy L. Butler.

Gene Stipe, of Stipe, Gossett, Stipe & Harper, Oklahoma City, Okl., for appellant, Phillip Leonard Gregg.

Paul A. Mancino, Jr., Cleveland, Ohio, for appellant, Wayne Herbert Reinke.

Mac Oyler, Oklahoma City, Okl., for appellant, Ronald James Slomkowski.

John E. Green and Susie Pritchett, Asst. U. S. Attys. (William R. Burkett, U. S. Atty., with them on the brief), for appellee.

Before SETH and HOLLOWAY, Circuit Judges, and BRATTON, District Judge.

SETH, Circuit Judge.

The indictment originally charged twenty-three defendants in one count of conspiracy to convert Government property in violation of 18 U.S.C. § 641 and to commit depredation against Government property in violation of 18 U.S.C. § 1361, and charged various combinations of these defendants in forty additional counts alleging substantive violations of these statutes. The individual motions to sever were denied, and the consolidated trial took slightly more than one week. We have before us the appeals of four defendants.

All twenty-three persons originally indicted were military and civilian employees of the United States Air Force working at Tinker Air Force Base, Oklahoma. The military defendants were members of either the 3d Mobile Communications Group or the 1984th Telecommunications Squadron, while the defendant Gregg, a civilian, was employed in the Redistribution and Marketing (R & M) facility at Tinker. R & M is basically a storage facility and clearinghouse for obsolete or unserviceable Air Force equipment. By following appropriate procedures Air Force personnel can withdraw items of equipment from R & M for use by their units. Such equipment is often "cannibalized" to provide needed repair parts or components which are not available through normal supply channels. Equipment which cannot be reintroduced to Government use is eventually sold for salvage value to private buyers. Although R & M houses various classes of equipment, this case primarily involves radio and electronic related items.

During the period between August 1971 and January 1972, the defendants allegedly conspired to and did obtain numerous items of equipment from R & M to be converted to their own use or destroyed. Sergeant Greene; who entered a guilty plea, and Sergeant Johnson appear to have been the key figures in the operation and the persons responsible for obtaining most of the equipment. The appellant Gregg, in his capacity as a clerk at R & M, allegedly assisted the two sergeants in procuring the equipment and concealing its disposition. The remaining appellants were recipients of equipment thus obtained. In addition, the appellant Slomkowski, in concert with certain other members of the 1984th Squadron allegedly conspired to and did destroy some component parts to a teletype test unit which had originally been obtained from R & M.

Although these appeals were consolidated for purposes of argument, the number and variety of issues asserted in each necessitates their separate, individual consideration.

*No. 73–1359—Tommy L. Butler:*

Appellant Butler was convicted under the general conspiracy count and under count 22 for having received a stolen radio in violation of 18 U.S.C. § 641. The record discloses that he was assigned to the 3d Mobile, and was a member of the same section as Sergeant Greene during a portion of the period during which the alleged conspiracy existed. Some time during November 1971 Sergeant Greene acquired a number of Jeep radios from R & M. After deciding that he personally could not use them, he apparently brought a number of them to the shop where he and Airman Butler worked and left them there with the understanding that anyone who wanted one could have one. Butler was apparently fairly new in the unit. Sergeant Greene, according to the record, may have indicated at the time that they were salvage and not accountable to the Air Force. Airman

Butler carried one of the radios to his quarters on base, where he uncrated it, examined it briefly, recrated it, and placed it in his locker. Shortly thereafter Airman Butler was reassigned to the Philippines. Upon his departure he left the radio behind in his military locker. His roommate testified that he left no instructions as to its disposition.

■ Only twenty-four of the more than 1,200 pages of testimony given at trial pertain directly to Airman Butler. His involvement in the events leading to this prosecution was apparently confined to the incident described above. Nowhere in the record can we find testimony implicating him in a conspiracy. This court has often noted that the essence of the crime of conspiracy is an agreement to violate the law. Carter v. United States, 333 F.2d 354 (10th Cir.). While the agreement need not take any particular form, there must at some point be a meeting of the minds in the common design, purpose, or objects of the conspiracy. One cannot become a conspirator until he has entered such an agreement, and, of course, such entry can be after the conspiracy is formed, but we find no evidence that Airman Butler ever became a conspirator. Appearing as a Government witness, Sergeant Greene testified that Airman Butler, as well as other members of their section, was aware of the arrangement between himself and Sergeant Johnson for procuring equipment from R & M. Assuming this conclusion to be correct, mere knowledge or approval of or acquiescence in the object and purpose of a conspiracy without an agreement to cooperate in achieving such object or purpose does not make one a party to a conspiracy. Jones v. United States, 365 F.2d 87 (10th Cir.). There is no suggestion that Airman Butler was ever aware of any specific plan to obtain the radios from R & M, much less that he cooperated in such a plan. Rather, the clear inference is that Sergeant Greene appeared with the radios, and left them at the shop for whomever might want one as unaccountable salvage. It was not

until that point that Airman Butler decided to take one to his quarters. Such an action alone simply cannot be interpreted as a decision to join a conspiracy. See United States v. Varelli, 407 F.2d 735 (7th Cir.).

■ We find the evidence equally insufficient to support conviction of the substantive offense of receiving stolen Government property in violation of 18 U.S.C. § 641. After taking the radio to his military quarters and examining it, Airman Butler placed it in his locker and apparently never again disturbed it. When he departed Tinker a few weeks later, it was left behind in the locker with no instructions as to its disposition. Nowhere does it appear that he attempted to remove it from the base or otherwise dispose of it to his advantage. In the plain language of the statute, knowledge that the property is stolen and intent to convert it to one's own use or gain are essential elements of the offense. Making the questionable assumption that Airman Butler knew that the radio had been stolen, his conduct, when viewed in the light of the other circumstances of this case, fails to carry sufficient suggestion of an intent to convert it to his own use or gain. It might even be argued, at least in a figurative sense, that the radio never left Government control.

We have evaluated the evidence, as we must, in the light most favorable to the Government and allowed it the benefit of every reasonable inference. Even so, we find the case against Airman Butler inadequate to support either conviction. We therefore reverse his conviction with instructions that the charges against him be dismissed.

*No. 73–1360—Phillip L. Gregg:*

Although originally charged in sixteen counts of the indictment, appellant Gregg was acquitted of all but the conspiracy charge. Our review of the record fails to uncover adequate support for that conviction as well.

During the period of the alleged conspiracy, Mr. Gregg was employed as a

civilian clerk at the R & M facility. He was assigned as a utilization specialist, responsible for a particular series of federal stock numbers consisting primarily of electronic communications equipment. His principal function was to process requests from various Government agencies for equipment within that series which might be in storage at R & M. While many of these requests were either by letter or the appropriate Department of Defense form, it was not unusual for Air Force personnel from the various units at Tinker to "shop" at R & M for items which their units might need or be able to use. When such an item was located Mr. Gregg, or other clerks holding similar positions, would assist the "customer" in completing the official requisition form, and then direct him to the appropriate agency to have the form approved. In most cases this would be the Depot Supply Officer, who would retain copies of the approved form for accounting purposes. The customer would then return to R & M with the approved requisition and would be issued the item. Mr. Gregg would also retain various copies of the approved requisition for R & M records and subsequent distribution. In some cases such distribution may have included the supply officer of the unit drawing the equipment. However, due to the volume of transactions at R & M, distribution of the retained copies did not always follow a consistent pattern, and reliance was placed on the Depot Supply Office to maintain accountability for the equipment after it left R & M. It appears there was also a requirement that "shoppers" from the units at Tinker have a letter of authorization from their unit on file at R & M. Again, because of the heavy volume of business, this requirement was not vigorously enforced with respect to uniformed personnel.

■ Although many of the transactions which Sergeants Greene and Johnson had with R & M involved Mr. Gregg, it is clear that he was not the only clerk who provided them assistance. Much of the Government's case hinged on sug-

gested irregularities in the handling of the documentation connected with the two sergeants' transactions, particularly in Mr. Gregg's failures on certain occasions to forward copies of the executed requisition forms to their unit supply officer. Mr. Gregg's supervisor testified, however, that such failures were neither irregular nor inconsistent with R & M policy at that time. The same would have been true with respect to any failure to check Sergeant Greene's authorization. Mr. Gregg was simply a clerk. His duties were to assist R & M customers in locating equipment which they might need and in completing the necessary paperwork. He had neither responsibility nor authority to approve requests, authorize withdrawals, or check the disposition of equipment once it left the R & M area.

The United States also stresses certain oral statements which Mr. Gregg made to the FBI agent investigating the case to the effect that Mr. Gregg suspected that some of the equipment withdrawn by the two sergeants could not be used by their unit, and that he knew some of it was being traded to other units. Making the dubious assumption that such statements might infer knowledge of a conspiracy, they certainly fall short of demonstrating cooperation in its objectives. As previously noted, mere knowledge or approval of or acquiescence in the objects of a conspiracy are insufficient to make one a conspirator. Jones v. United States, *supra*. While it may have been advisable for Mr. Gregg to report his suspicions, there was no showing that he had an official responsibility to do so.

Two additional factors further disrupt this already inconclusive web of circumstantial evidence. Sergeant Greene, who was presumably the core figure in the conspiracy, testified as a prosecution witness. Yet nowhere in his more than 150 pages of testimony did he identify Mr. Gregg as a co-conspirator, or mention any manifestation of Mr. Gregg's agreement to cooperate in an illegal enterprise. To the contrary, we find only

evidence that Mr. Gregg provided ordinary service and assistance, nothing beyond that expected of him in his normal course of employment. Secondly, we find no evidence indicating motive for Mr. Gregg's cooperation. Nowhere does it appear that he received any of the property withdrawn from R & M or any other form of compensation or benefit for his assistance. On the one occasion when Sergeant Greene asked whether he might be interested in a particular camera, Mr. Gregg rejected the offer. Were he in fact involved in any conspiracy, his services were evidently gratuitous.

As we observed with respect to Airman Butler, some manifestation of agreement to cooperate in the methods or ends of a conspiracy is essential for one to become a conspirator. Mere knowledge, even of the conspiracy itself, is insufficient. We find no evidence of Mr. Gregg's agreement to cooperate or of his actual cooperation; insinuation is certainly not enough. Accordingly we reverse appellant Gregg's conviction with instructions that the charge against him be dismissed.

*No. 73–1363—Ronald J. Slomkowski:*

Appellant Slomkowski was originally named in the conspiracy count, in count 33 charging receipt of stolen Government property in violation of 18 U.S.C. § 641, and in count 41 charging depredation against Government property in violation of 18 U.S.C. § 1361. He was convicted of conspiracy and receipt of stolen Government property, but was acquitted of the depredation charge.

Sergeant Slomkowski is a career Air Force noncommissioned officer who had over eighteen years' service at the time of trial. In early August 1971, he was transferred to Tinker Air Force Base and assigned as the noncommissioned officer in charge of the Teletype Maintenance Shop of the 1984th Communications Squadron. Shortly after assuming his duties Sergeant Slomkowski noted that the shop lacked certain essential equipment needed in the performance of its mission. His inquiries revealed that some of this equipment would not be available through normal supply channels for over one year. It was then that he learned of the practice of obtaining salvageable equipment and repair parts from R & M, and decided to investigate this as a possible method of meeting the needs of his shop. He obtained the names of several individuals reputedly familiar with the R & M operation, and he eventually met Sergeant Greene at R & M. At their first meeting Sergeant Greene directed Sergeant Slomkowski to certain areas of the R & M facility where he might find the type of equipment which he needed. At a later time Sergeant Greene visited the Teletype Maintenance Shop which had recently been relocated in a larger building. Sergeant Slomkowski explained his equipment needs in greater detail, and Sergeant Greene mentioned that he might have access to equipment of this type at R & M. In any event Sergeant Greene thereafter made several deliveries to the shop. The items which he brought included an industrial vacuum cleaner, an IBM typewriter, several Jeep radios, a wave form monitor, and an electronic test unit housed in a large metal cabinet.

In addition to attacking the sufficiency of the evidence, Sergeant Slomkowski alleges a number of procedural defects in the proceedings below. Should we be required to consider them, several of these procedural defects would themselves necessitate reversal. It is our conclusion, however, that there is indeed insufficient evidence to sustain either conviction, and it is on that basis that we decide this appeal.

The conspiracy count, which named all twenty-three defendants, alleged as dual purposes of the conspiracy the violations of both 18 U.S.C. §§ 641 and 1361. We of course have considered the evidence in the light most favorable to the United States. Even so we cannot find convincing evidence that Sergeant Slomkowski conspired toward either purpose. It is always difficult to evaluate evidence in a conspiracy case,

and because of the secretive nature of the crime, the evidence is almost invariably circumstantial. As the Supreme Court has warned, however, caution must be taken that the conviction not be obtained "by piling inference upon inference." Direct Sales Co. v. United States, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674. That admonition, we think, has special relevance in cases such as this, where many defendants, some of whom were not even acquainted, are charged on the basis of varying degrees of participation at various times. Guilt must be determined individually and not merely by association. Our review of the evidence must therefore be especially meticulous. The evidence, when viewed in its entirety, must generate more than a mere suspicion of guilt, and where such evidence is equally consistent with both guilt and innocence the conviction cannot be sustained. Lewis v. United States, 420 F.2d 1089 (10th Cir.); Doty v. United States, 416 F.2d 887 (10th Cir.), vacated on other grounds as to defendant Epps sub nom. Epps v. United States, 401 U.S. 1006, 91 S.Ct. 1247, 28 L.Ed.2d 542; Brumbelow v. United States, 323 F.2d 703 (10th Cir.).

■ The United States sought to implicate Sergeant Slomkowski in the portion of the conspiracy directed toward converting Government property largely on the inferences to be drawn from two factors: (1) that several items which Sergeant Greene had obtained from R & M were delivered to the maintenance shop with Sergeant Slomkowski's knowledge and consent; and (2) that some of these items were later discovered in a search of Sergeant Slomkowski's quarters on the base. In addition there was also reference to a transaction involving some drafting chairs which had been obtained from R & M by one of the members of the 1984th. A number of these chairs were later found in the quarters of various individuals, including Sergeant Slomkowski, where they had evidently been repaired and restored for use as bar stools. Aside from the fact that the four stools found in

Sergeant Slomkowski's quarters had never been taken from the base or otherwise treated in a manner inconsistent with an intent eventually to return them, we find the evidence relating to the acquisition of the chairs, their condition, and their accountability to the Air Force so inconclusive as to render impossible any finding of an intended or actual conversion of Government property. Returning then to the two principal factors, we are unable to discern in the circumstances surrounding the deliveries of the equipment to Sergeant Slomkowski's shop, any indication of the knowledge, intent, or agreement necessary to make him a coconspirator. Ingram v. United States, 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503. Nowhere is there evidence of any discussion or understanding with Sergeant Greene or anyone else pertaining to illegal acquisition of property for personal use or gain. In his testimony Sergeant Greene did not identify Sergeant Slomkowski or any other member of the 1984th as having knowledge of his arrangement with Sergeant Johnson to obtain property for one another's personal benefit. Nor did he testify to any knowledge on Sergeant Slomkowski's part that the property was being illegally obtained or converted, nor any agreement with him to obtain or convert equipment illegally. In short, there is nothing inconsistent with Sergeant Slomkowski's own testimony that he was merely pursuing an alternative method suggested by his superiors of acquiring property needed by his shop. We shall discuss the circumstances surrounding the discovery of the typewriter, the wave form monitor, and four drafting chairs in Sergeant Slomkowski's quarters in greater detail below. Suffice it to say at this point that those circumstances likewise fail to demonstrate cooperation in any conspiracy to convert Government property.

■ The second illegal objective of the alleged conspiracy was a depredation against Government property in violation of 18 U.S.C. § 1361. This portion of the charge pertains to the dispo-

sition made of certain component modules contained in an electronic test unit which Sergeant Greene delivered to the Teletype Maintenance Shop. There is considerable confusion in the record as to the actual condition of these modules when the test unit was obtained from R & M. A number of the prosecution's witnesses testified to their apparent good condition. Such testimony, however, was based on casual, visual inspections by witnesses who were not particularly familar with the equipment. It is undisputed that the unit had been classified as electronic scrap by R & M. The requisition document described the unit simply as 200 pounds of class 5800 (scrap) having a unit value of $1.00 per pound. There was also testimony from both the commanding officer and the maintenance superintendent of the 1984th that it was the common and recognized practice with equipment thus classified, so-called "red tag" equipment, to remove any salvageable parts or components and dispose of the remnants without accountability to the Air Force. Such equipment was available for cannibalization or use in any manner which the unit saw fit. In any event there was testimony indicating that Sergeant Slomkowski had directed various individuals in his shop to remove several of the component modules from the test unit cabinet, destroy them, and place the pieces in plastic bags for distribution among various trash receptacles on base. Recognizing that such a manner of disposition appears somewhat suspicious, we nevertheless conclude, in view of the uncertainty as to the status, condition, and accountability of the unit itself, that there was not sufficient demonstration of illegal conduct. It is often observed that in order to be guilty of conspiracy, one must have at least the degree of criminal intent necessary for the commission of the substantive offense. Ingram v. United States, 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503. We cannot say under the circumstances of this case that the United States has by substantial evidence shown either that the test unit could have been the object of criminal depredation, or that Sergeant Slomkowski had either the knowledge that destruction of the components might be a criminal act or the intent to commit such an act. We feel the need to note one further defect in the pleading and proof of this aspect of the case. Section 1361 specifies that the damage to the property measures the degree of the offense, not the value of the property as was alleged in the indictment. In order to constitute a felony the damage must exceed $100.00. The requisition document indicated that R & M had estimated the value of the unit as scrap at $1.00 per pound for a total value of about $200.00. We find no evidence that would allow the jury to infer what the amount of damage caused by the destruction of some of the components might have been, or that such damage would have exceeded $100.00.

■■■■ The conviction of the substantive offense of receiving stolen Government property was based upon the discovery, during a search of Sergeant Slomkowski's quarters on the base, of an IBM electric typewriter, a wave form monitor, and four drafting chairs, all of which had originally been obtained from R & M. As we mentioned previously, conviction for receiving stolen Government property in violation of 18 U.S.C. § 641 requires proof that the defendant had knowledge that the property was stolen and that he intended to convert it to his own use or gain. We cannot find substantial evidence of either of these elements with respect to Sergeant Slomkowski. If indeed the property was stolen, there is no indication that Sergeant Slomkowski knew it. The testimony is entirely consistent with his belief that the property had been legitimately obtained for use by his unit. The IBM typewriter, when delivered by Sergeant Greene, was equipped with capital letters only. In order to make it serviceable for use at the shop, Sergeant Slomkowski testified that he took the typewriter to his quarters to convert the typeface during his off-duty hours. The

typewriter, when discovered, was partially dismantled on a work table. Alongside it was a tool kit containing some assorted typewriter parts. Such evidence, we believe, corroborates Sergeant Slomkowski's testimony. It certainly fails to provide a clear suggestion of an intent to convert the typewriter to his own use or gain. Similarly Sergeant Slomkowski testified that he had borrowed the wave form monitor to align his son's stereo. When discovered, the monitor was indeed connected to some stereo components. While perhaps a conversion in a literal sense, we do not believe such a temporary use in these circumstances manifests the underlying criminal intent necessary to commit an offense under section 641. See Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288. There is no evidence tending to show that Sergeant Slomkowski had any other purpose in mind with respect to the monitor. Finally, we have already noted the uncertainty surrounding the drafting chairs. We find no evidence that Sergeant Slomkowski believed other than that the chairs were surplus unaccountable property, or that he took them other than as an alternative to their being discarded as refuse. To this we would also add that it was not uncommon for military personnel to borrow furnishings from the Air Force for use in their quarters, such furnishings to be returned upon their departure from the base.

We are unable to conclude that the mere location of these various items in Sergeant Slomkowski's military quarters, when considered in light of Sergeant Slomkowski's duty assignment and the circumstances under which they were discovered, can support a conviction for receiving stolen Government property in violation of section 641.

We again emphasize that, while we must review the evidence in the light most favorable to the prosecution, when the evidence so viewed fails to generate more than mere suspicion or insinuation of guilt, the conviction cannot be sustained. The standard of proof required in criminal cases is a cornerstone of constitutional due process. In a case such as this one, involving numerous defendants, multiple transactions, and varying degrees of participation, the task of sifting the evidence relating to each defendant becomes particularly difficult, and a special danger exists that the degree of proof required for conviction might be relaxed. We shall be particularly vigilant in such cases to see that such a relaxation does not occur and that conviction is not predicated upon suspicion. See Doty v. United States, supra. Accordingly, convictions under both counts are reversed with instructions that all charges against Sergeant Slomkowski be dismissed.

*No. 73-1362—Wayne Reinke:*

Appellant Reinke was named in the conspiracy count and in Count 31 charging receipt and conversion of stolen Government property in violation of 18 U. S.C. § 641. He was convicted of both charges. In his brief Mr. Reinke alleges twenty-five grounds for reversal. Among these is the assertion that there is insufficient evidence to support the convictions. Unlike the other three appeals, however, we are not prepared to find the evidence against Mr. Reinke is inadequate. Nevertheless, we reverse his convictions on the basis of a fundamental procedural error which has tainted the proceedings against him.

As we have noted, all twenty-three original defendants were named in count 1 of the indictment charging a conspiracy to commit offenses under 18 U.S.C. §§ 641 and 1361. It has been the United States' position both at trial and on this appeal that the numerous transactions involved in this case can be incorporated into one conspiracy to which all twenty-three defendants were parties. The evidence does not support that position. If indeed the various transactions can be correlated at all, it is in no fewer than three distinct possible conspiracies.

By his own testimony Sergeant Greene indicated that he and Sergeant Johnson had an understanding between themselves relating to the acquisition of property from R & M for one another's

personal use. According to Sergeant Greene, most of the members of his section of the 3d Mobile were aware of this understanding. Whether they were parties to it is questionable. In any event Sergeants Greene and Johnson were responsible for obtaining the majority of the items from R & M which figure in this action. They evidently kept many of these items for themselves. Others, which they could not use, were taken either to the 3d Mobile or the Teletype Maintenance Shop of the 1984th, where some of them eventually came into the possession of various other defendants. Some of these defendants participated in only one such transaction. With the exception of Sergeants Greene and Johnson, none of the 3d Mobile defendants apparently had any significant contact with defendants from the 1984th. Nevertheless, in view of the understanding between Sergeants Greene and Johnson, we will consider the transactions in which they participated as arguably related in one possible conspiracy.

The second possible conspiracy focuses on the destruction of the component modules in the test unit which had been delivered to the 1984th. We have already commented on the considerable uncertainty as to the status, condition, and accountability of the unit. Those issues aside, however, were the unit a possible target of criminal depredation and had Sergeant Slomkowski and the other members of the 1984th conspired toward such an objective, we would still find it impossible to merge such a conspiracy with the supposed conspiracy involving Sergeants Greene and Johnson. The decision to dispose of the modules was evidently not made until after the unit had been in the 1984th shop for some time. It is unlikely that most of the 3d Mobile defendants knew of the existence of the unit. It is inconceivable that they planned or anticipated its destruction. The mere fact that Sergeant Greene had obtained the unit from R & M and delivered it to the 1984th is simply too tenuous a thread to link its eventual destruction with the other transactions under consideration.

Finally, there are the events pertaining to the drafting chairs. We have noted the uncertainty enshrouding this incident. At most, however, it appears that the chairs were obtained from R & M by Sergeant Lopez, a member of the 1984th, and distributed through him to various other members of that unit. Other than their common source no link was established between the acquisition of the chairs and the acquisition of the other items with which we are concerned. Indeed, it appears that not even Sergeant Greene knew of this transaction.

■ We are thus confronted with a situation in which one general conspiracy has been alleged, while the evidence can support the existence of no fewer than three. Although some of the parties may have been involved in more than one of these combinations, no one such combination embraced the objectives of the others. Such a variance between the indictment and the evidence poses problems on at least two levels. Initially, of course, it requires a determination whether more than harmless error has resulted. We must conclude that it has. The factors which necessitate this conclusion were exhaustively discussed by the Supreme Court in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557. We need not elaborate on them here. We add only that the rationale of that case is made more forceful here by the presence of distinctly different purposes in at least two of the possible conspiracies. In Kotteakos the various conspiracies, although involving different defendants, followed similar patterns and had as their objectives the violation of the same statute. Here, however, two of the supposed conspiracies were directed at obtaining and converting Government property, while the third was aimed at destroying Government property. Thus the burden on a defendant whose participation was limited to one of the conversion conspiracies, and yet who must defend himself against charges of conspiring also to commit depredation, becomes even more oppressive.

Having concluded that the variance is material, an appropriate remedy must now be considered. Two alternatives exist. The first would be the use of an instruction alerting the jurors to the possibility of multiple conspiracies and admonishing them to separate and distinguish such conspiracies and the defendants involved therein. Such an instruction was held appropriate by the Seventh Circuit in the case of United States v. Varelli, 407 F.2d 735 (7th Cir.), in a situation where joinder of defendants and offenses was otherwise proper. The second alternative is the severance of the various conspiracies and the defendants allegedly involved therein for separate trial. This was the procedure held necessary in the Kotteakos case. The point at which an instruction no longer provides adequate protection and a severance must be granted is incapable of precise location. It must be determined in light of the facts of the particular case and with reference to the established rules otherwise governing joinder and severance.

▮ Rule 8(a) of the Federal Rules of Criminal Procedure provides that two or more offenses may be charged in the same indictment "if the offenses charged . . . are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Rule 14, on the other hand, provides generally that severance or other appropriate relief may be granted if it appears that a defendant or the Government is prejudiced by joinder of either defendants or offenses. Ordinarily, severance is a form of relief resting within the sound discretion of the trial court, and unless abused that discretion will not be questioned on appeal. See, for example, Baker v. United States, 329 F.2d 786 (10th Cir.), cert. denied, 379 U.S. 853, 85 S.Ct. 101, 13 L. Ed.2d 56. However, when joinder of either defendants or offenses causes the actual or threatened deprivation of a fair trial, severance is no longer discretionary. As the Supreme Court observed in Kotteakos:

" . . . Guilt with us remains individual and personal, even as respects conspiracies. It is not a matter of mass application. There are times when of necessity, because of the nature and scope of the particular federation, large numbers of persons taking part must be tried together or perhaps not at all, at any rate as respects some. When many conspire, they invite mass trial by their conduct. Even so, the proceedings are exceptional to our tradition and call for use of every safeguard to individualize each defendant in his relation to the mass. Wholly different is it with those who join together with only a few, though many others may be doing the same and though some of them may line up with more than one group.

"Criminal they may be, but it is not the criminality of mass conspiracy. They do not invite mass trial by their conduct. Nor does our system tolerate it. That way lies the drift toward totalitarian institutions. True, this may be inconvenient for prosecution. But our Government is not one of mere convenience or efficiency. It too has a stake, with every citizen, in his being afforded our historic individual protections, including those surrounding criminal trials. About them we dare not become careless or complacent when that fashion has become rampant over the earth."

We conclude, as did the Supreme Court, that here "toleration went too far." The United States has attempted to merge what, if anything, should be at least three separate, distinct conspiracies into one. Twenty-three defendants were named in the indictment. Different combinations of these defendants were involved in nearly every transaction which figured in the trial. Many of the defendants did not know one another prior to trial. Some of the members of the 3d Mobile may have assisted Sergeant Greene in obtaining and converting Government property

from R & M. It is impossible, however, upon the evidence presented at trial, to link any of them with the destruction of an electronic test unit by members of another organization located elsewhere on the base. Sergeant Greene, himself, testified that he had not known of the destruction of the unit. There is no evidence that appellant Reinke ever knew the unit existed. Yet because Mr. Reinke may have shared mutual acquaintances with those who collaborated in the destruction of the unit, he was forced to acquit himself of their actions. One can only guess whether he was also forced to share their guilt. We can envision circumstances where what has been alleged as one conspiracy is disclosed at trial to be several repetitive conspiracies in which there is substantial identity of parties and method. The possible conspiracy concentrating on Sergeants Greene and Johnson may prove to be an example. In such circumstances a curative instruction may well bridge the gap between pleading and proof. Such is not the case here. Mr. Reinke, whose participation was limited to his association with Sergeant Greene and the other members of the 3d Mobile, should have been tried only on the charges arising from that association. The possibility that the issue of his guilt was confused with the guilt of other defendants involved in unrelated transactions at different times and in different places is too great. His convictions must therefore be reversed, and the case is remanded for a new trial.

Because of the possibility that appellant Reinke will again be tried on some of these charges, we shall also comment on some matters pertaining to the use as evidence of certain statements which he made to Government investigators and certain items which were discovered in his home during the investigation. The Government contends that the statements and the items were obtained with Mr. Reinke's voluntary consent after having been advised of his rights. The Government agent involved testified during the trial that such was the case.

If accepted, that testimony would appear to furnish a satisfactory basis for findings of voluntariness and knowing waiver. We defer ruling on the matter, however, and leave resolution of these factual issues to any future proceedings. In addition, it appears that the advice of rights form which Mr. Reinke signed on March 30, 1971, may be defective under the decision in United States ex rel. Williams v. Twomey, 467 F.2d 1248 (7th Cir.), although we have some question whether Mr. Reinke was in custody at that time. See also our decision in Sullins v. United States, 389 F.2d 985 (10th Cir.). The United States, however, has apparently decided against the use as evidence of the statement made by Mr. Reinke on that occasion. As Mr. Reinke's other statements were made following appropriate Miranda warnings, the defective warning would not appear to present a problem.

We have studied the other issues raised by Mr. Reinke, but conclude that we need not comment on them in view of our disposition of the case.

The judgment as to Mr. Reinke is reversed and remanded for further proceedings consistent herewith.