**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Barbara CROCKER, aka Barbara Stafford, Defendant-Appellant.**

**No. 74–1372.**

United States Court of Appeals, Tenth Circuit.

Submitted Jan. 23, 1975.

Decided Feb. 18, 1975.

---

John E. Green, Asst. U. S. Atty., Oklahoma City, Okl. (William E. Burkett, U. S. Atty., Oklahoma City, Okl.), for plaintiff-appellee.

Mark H. Price, Oklahoma City, Okl., for defendant-appellant.

Before HILL, SETH and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Barbara Crocker, a/k/a Barbara Stafford (hereinafter referred to as Crocker, or appellant), appeals from a jury verdict of guilty and sentence. She was convicted of charges under 18 U.S.C.A. § 371 and § 472, to-wit: That on or about November 12–13, 1973, Crocker did conspire with Jackie Wayne Blankenship and Kelly Mack Lambeth, with intent to defraud, wilfully, unlawfully and knowingly, the United States, by concealing and possessing falsely made, forged, and counterfeit $10.00 Federal Reserve Notes, and that she did utter and pass one of said notes in Oklahoma City, Oklahoma, on November 12, 1973.

Crocker testified substantially as follows both in support of her Motion to Suppress her statements of confession, and at trial: She met Blankenship and Lambeth in a bar at Dallas, Texas, on November 11, 1973; she had known Blankenship slightly prior thereto; the three consumed considerable beer before driving to Oklahoma City, where they checked into a motel in the early morning of November 12th; that afternoon Crocker learned for the first time that Blankenship and Lambeth possessed counterfeit money, which they displayed to her; that when she was asked to drive to a restaurant to bring food back to the motel rooms after noon, that she told her male companions she would have nothing to do with the counterfeit money and that Lambeth then gave her "legitimate" money; that thereafter the three went to several bars; that at the After Five Club she asked Lambeth for money to buy cigarettes; that he gave her a $10.00 bill which she believed to be genuine and not counterfeit because Lambeth had previously told her he would not give her counterfeit money; that the change she received from the $10.00 bill after purchasing the cigarettes was given to Lambeth; that she was pretty intoxicated when she arrived at the club; that the three were arrested by two Oklahoma City detectives about 12:30 p. m. and taken to the county jail about 3:30 a. m.; that she was first questioned about 7:00 a. m. on November 13th, when she was taken from her cell to a meeting room where she met two Secret Service agents; that she did not feel well because of the drinking and lack of sleep for a couple of days; that without coffee or breakfast she was interrogated by Secret Service Agent Clark and another agent after Clark read her "my rights" which she thereafter acknowledged by her signature after personally reading the *Miranda* warnings document; that immediately thereafter she told Clark "that I wanted an attorney"; that even though she had requested an attorney, Clark asked her some personal questions about her parents, her children, etc., and that he stated that he and the other agent would like to help her out of the trouble she was in; that Clark then inquired of her about her acquaintance with Blankenship and Lambeth and whether she had seen anyone pass any counterfeit money; that she did not respond to these questions; and that Clark then advised her to get some sleep and stated that someone would question her in the afternoon.

Crocker testified that when she signed the *Miranda* form she was "half asleep", not feeling well, and that neither agent said anything to her about providing her with an attorney. She further related that she was returned to her cell about 8:00 a. m. and that about 3:30 that afternoon, Agent Clark and a couple of other Secret Service agents, including a Mr. Skiles, took her to the Federal Building; that Agent Skiles read her "my" rights before any questioning was undertaken; that after some one-half hour of interrogation she was fingerprinted and photo-

graphed; that about 5:00 p. m. she was returned to a conference room where Agent Skiles first presented her a written *Miranda* "rights" document which she read and signed, and that at that time she also signed the statement of confession prepared by Skiles after she "skimmed" through it; that although she asked for an attorney during the morning session she did not again request counsel; that although the two waiver forms which she signed (both of which were admitted in evidence without objection) state that "If you want a lawyer, a lawyer will be appointed for you", and both of which contain her written statement that "I do not want a lawyer", that she nevertheless "didn't know that the statement said 'I didn't want a lawyer'"; that she did not reiterate her request for an attorney after the morning statement to Agent Clark and that it was not until she appeared before Judge Eubanks on the morning of November 14th, that she was told an attorney would be appointed to represent her; that she is 36 years of age, has an 11th grade education, and can read and write the English language; that none of the officers made any promises or threats to get her to talk to them, and that they treated her courteously; that she was convicted in Texas in 1965 of the felony of forging a prescription and money orders and sentenced to serve three years.

When questioned by the Court, she stated that although both of the "warning" documents which she signed state that she is entitled to a lawyer and that one will be appointed for her, and that she did not want a lawyer, that she "didn't read that part" even though she acknowledged it was read to her and that it stated unequivocally that "I do not want a lawyer at this time."

Both at the hearing on the motion to suppress and at trial, Special Agent Clark testified that at about 8:00 a. m. on the morning of November 13, 1973, he spoke with Crocker after he and Agent Don Snyder had produced their credentials and identified themselves; that he provided her with a standard warning and waiver of rights document which she read, and that he also read one completely to her; that the document is in two parts, the first containing each of the *Miranda* rights and warnings, and the second consisting of a waiver of those rights; that after she read the form and after he read it aloud to her Agent Clark inquired of her whether she had any questions concerning it; that she stated that she did not; that she then signed the waiver; that at no time during the interrogation, which lasted about 30 minutes, did Crocker ask for an attorney, and that had she done so, he would simply have obtained personal data, i. e., name, age, residence, occupation, education, parents, etc.; that he did question Crocker about the counterfeit money but that she made no admissions or statements relative thereto; that it is possible, although beyond his recollection, that Crocker made some remark about an attorney, but that she did not state that she wished to have an attorney present; and that Crocker did have a fatigued appearance.

When Clark was asked whether it is *possible* that Crocker could have asked for an attorney during the interview, he acknowledged that it was possible, but that he had no such recollection. He stated that the procedure followed by the Service when one asks for counsel is to *terminate* the questioning. He stated that Crocker definitely did not request that an attorney be present. The testimony of Agent Clark was fully corroborated by Agent Don Snyder. He testified, when questioned by the Court, that Crocker made no reference about an attorney, and that if it had been made the procedure of the Service is to terminate questioning.

Agent Skiles testified that about 4:30 p. m. on November 13th, he interrogated Crocker after first orally advising her of her rights and then handing her a printed copy of the *Miranda* rights document which she read and which he read aloud to her from another copy; that he then inquired of Crocker if she had any questions; that she had none; that she did

not request an attorney; that she then signed the waiver of rights form and thereafter signed the confession statement in his presence and that of Agent Clark. While there is no discrepancy about the fact that Agent Skiles first orally advised Crocker of her rights prior to any interrogation, there is a conflict in the testimony of Skiles and Clark as to the *time* when Crocker executed the written waiver. Skiles recalls that she executed it at about 5:00 p. m. Clark recalls that she executed it concurrent with her execution of the confession statement about 8:00 p. m., even though the time on the document appears as of 5:00 p. m. We attach no particular significance to this difference in recollection. There is no showing that it prejudiced Crocker's rights. The different recollections were presented and argued to the jury, insofar as they may have related to credibility.

The agents testified that Crocker was not taken before a magistrate on November 13th because none was available and further, upon inquiry, they learned that none of the judges were available. Agent Clark testified that the waiver document executed by Crocker in the morning could not be located by him when the evening interview was commenced, and that this necessitated the need for the additional warning-waiver form. Thereafter, however, Agent Clark did locate the form executed that morning.

The suppression motion was directed both to the oral statement made by Crocker during the morning interview and the written statement executed following the afternoon interview.

In ruling on the motion to suppress, the Trial Court held that Crocker voluntarily gave the oral statement after being fully informed of and then voluntarily waiving her rights, and that even though she testified that she did not realize what she was signing, this testimony was not credible. The Court stated that it was following the guidelines of 18 U.S.C.A. § 3501 and that Sullins v. United States, 389 F.2d 985 (10th Cir. 1968),

was superseded by § 3501, *supra.* The Court made a factual determination that Crocker did not request the assistance of counsel after being fully advised of her *Miranda* rights.

The Court placed much weight on the fact that, in the face of Crocker's contention that she requested counsel, she nevertheless voluntarily and without force, threat or intimidation knowingly signed *two* written statements that she did not want a lawyer. The Court stated that Crocker's incriminating statement would be admitted in evidence in accordance with the facts found and the provisions of 18 U.S.C.A. § 3501, but that the jury shall hear all relevant evidence and argument on the same issue of voluntariness and that the Court would instruct the jury to give such weight to the confession as it deserves under all of the circumstances.

On the issue of delay in presentment for initial appearance, the Court found that even though the confessions were made more than six hours following Crocker's arrest, there was no available magistrate or other officer on November 13th, for appearance purposes and that, in any event, her statements were voluntarily given.

At trial proper, Government witnesses in addition to Secret Service Agents, Clark, Snyder and Skiles (who testified substantially to the same effect as they had at the hearing on the Motion to Suppress), included the owner and certain employees of the After Five Club who testified that Crocker, Blankenship and Lambeth passed four counterfeit $10.00 bills at the Club during the late evening hours of November 12th and the early morning hours of November 13th, while drinking beer; and that with specific reference to Crocker she was at all times in the presence of Blankenship and Lambeth.

Hilger, the assistant manager and bartender, testified that Crocker presented him with a counterfeit $10.00 bill and requested change for cigarettes which he gave her; that he received the four $10.00 counterfeit bills within a period of

some eight minutes from the three, and that the bills appeared new but crumpled badly; that he examined them and discovered that two of the bills contained the same serial number; that he then phoned the owner, Pye, who arrived soon thereafter accompanied by two Oklahoma City detectives who examined the bills and took possession of them after Hilger had initialed at least two of them.

Pye testified that three additional $10.00 counterfeit bills which he had received from his manager, Larry Cook, had been passed earlier in the evening by two men and one woman at his Mark III Club in Oklahoma City.

Mrs. Pye testified that she recalled observing two men and a woman at the Mark III Club about 11:00 p. m. that evening. She recognized one, Blankenship, and recalled that one $10.00 bill was passed to her for payment of beers which she served the three persons.

Detectives Hoover and O'Shea testified that they examined the four $10.00 bills at the After Five Club and that each contained the same serial number; and that after Hilger and other employees of the club informed them of the facts and circumstances relating to the bills, they placed Crocker and her two male companions under arrest. They were taken to the city jail where a preliminary search for weapons was undertaken, followed by an inventory search. At that time 278 counterfeit $10.00 bills were found on the person of Blankenship. Several were found on the person of Lambeth. None were found on the person of Crocker.

The written statement executed by Crocker, underlined in evidence without objection, includes, inter-alia, her acknowledgment that before she was questioned she voluntarily signed a Warning and Consent to Speak document, waiving her Constitutional rights and authorizing Agent Skiles to interrogate her about counterfeit $10.00 bills; that she did not learn that Blankenship and Lambeth had the counterfeit bills until after they awoke in the motel in Oklahoma City on November 13th; that when she was

asked to purchase some fried chicken and beer at a nearby restaurant she insisted that Lambeth not give her any of the counterfeit $10.00 bills to pass; that he gave her that which she believed to be a genuine $10.00 bill; that after eating they visited some eight or ten bars in the Oklahoma City area and that they had a beer apiece in each bar; "that on two occasions Kelly Lambeth gave me a counterfeit $10.00 bill and I asked for change to purchase either cigarettes or change to play the juke box. I knew these two bills were counterfeit when they were given to me by Kelly Lambeth." (Underlining supplied).

She testified at trial, just as she had previously at the hearing on the Motion to Suppress, that she did not read this language in the statement and that she "skimmed" through it before signing it.

On appeal Crocker alleges trial court error in that: (1) the burden of proof was incorrectly placed upon her rather than on the Government in relation to the pre-trial hearing on her motion to suppress a statement of confession given by her; (2) it incorrectly applied the guidelines set forth in 18 U.S.C.A. § 3501 rather than those set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); (3) it admitted Crocker's confession in evidence without requiring the Government to sustain its admissibility under the "heavy burden" required of the Government by *Miranda, supra*; and (4) the evidence is insufficient to sustain the conviction.

I.

Crocker contends that the Trial Court erred in placing the burden of proof on her rather than on the Government at the pre-trial hearing on her Motion to Suppress the written statement she signed in the presence of Agents Skiles and Clark. In support thereof she relies upon Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), for the proposition that the burden of proving compliance with the procedures set forth therein is with the Government

and that it is a heavy burden, quoting this language:

> If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel . . This Court has always set high standards of proof for the waiver of constitutional rights, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and we re-assert those standards as applied to in-custody interrogation. Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders.

384 U.S. at 475, 86 S.Ct. at 1628.

■ Crocker also cites Bond v. United States, 397 F.2d 162 (10th Cir. 1968), cert. denied 393 U.S. 1035, 89 S.Ct. 652, 21 L.Ed.2d 579 (1969), in further support of her contention. We do not so interpret *Miranda* or *Bond*. In the instant case the argument, in the context presented, is without merit in that appellant complains that she was required by the Court "to assume the burden of proof and of going forward with the evidence." (Appellant's B., p. 20). It is fundamental that on a motion to suppress there must be "a foundation in fact for the legal result." Rogers v. Richmond, 365 U.S. 534, 546, 81 S.Ct. 735, 742, 5 L.Ed.2d 760 (1961). Logic dictates that a pre-trial Motion to Suppress filed by an accused does in fact cast the burden upon the movant to present facts necessary to sustain his position. Wilson v. United States, 218 F.2d 754 (10th Cir. 1955). Bond v. United States, *supra*, is, in fact, no comfort to appellant:

> During the trial the defendant moved for a hearing outside the presence of the jury to determine the admissibility of certain evidence including his admissions. The motion was denied on the ground that the matters had been covered by *an evidentiary hearing* held before the trial on a defense motion under Rule 41(e), F.R.Crim.P., to suppress. The record shows that . . at the Rule 41(e) hearing the government produced some of the same witnesses as appeared at the trial, *that the defense put on no evidence,* that after the hearing the court made specific findings of fact, which are sustained by the evidence, and denied the motion . . . the trial judge did not abuse his discretion in denying a second hearing. (Emphasis supplied).

397 F.2d 162 at 165.

■■ While the defendant must first present evidence in support of his motion to suppress which satisfies his burden of challenging the legality of the confession, we have recognized that the Government *must then* carry the countervailing burden of proving a waiver of the constitutional privilege against self-incrimination. Bond v. United States, *supra*; Nolan v. United States, 423 F.2d 1031, 1045 (10th Cir. 1969), cert. denied 400 U.S. 848, 91 S.Ct. 47, 27 L.Ed.2d 85 (1970); Sullins v. United States, *supra*. The Government fully met the burden in the case at bar.

■ Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), put at rest the contention that prosecutors have a particularly heavy burden of proof to meet in a Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) pre-trial hearing on the issue of the voluntariness of a confession. The Court there stated that the duty to determine voluntariness had not been framed in terms of burden of proof either before or after *Jackson*. While observing that *Jackson* contained reference to the relationship between the involuntariness of a confession and its reliability, the Court stated that the case turned on the proposition that coerced confessions, whether true or false, are forbidden because the *method* used to extract them offends constitutional principles. *Lego* held that

when the burden has been cast on the Government to establish the voluntariness of a confession, the measure or quantum is that of preponderance but not beyond a reasonable doubt.

## II.

Crocker argues that the trial court erred in applying the guidelines of 18 U.S.C.A. § 3501[1] rather than the mandates of Miranda v. Arizona, *supra*, in its pre-trial determination of the voluntariness of her written confession and its admissibility at trial for consideration by the jury.

Appellant contends that § 3501 allows greater discretion in the trial court in determining the issue of voluntariness and thus the admissibility of a confession

than the principles of Miranda which are constitutionally mandated to satisfy the commands of the Fifth Amendment. The Government counters that Crocker's confession met both the commands of Miranda and § 3501.

18 U.S.C.A. § 3501 (Public Law 90–351) is referred to as the "Post Miranda Act." The legislative history relates that it is intended to offset the "harmful" effects of certain court decisions relating to the admissibility of confessions, including the Miranda decision (U.S.Code Cong. and Admin.News, 1968, Vol. II, 90th Congress, 2nd Session, p. 2127).

■■ The basic premise of Miranda is that custodial interrogation is inherently coercive. The Miranda procedures require that an interrogating officer ac-

1. § 3501. Admissibility of confessions.

(a) In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

(b) The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

*The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.*

(c) In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: *Provided,* That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate or other officer.

(d) Nothing contained in this section shall bar the admission in evidence of any confession made or given voluntarily by any person to any other person without interrogation by anyone, or at any time at which the person who made or gave such confession was not under arrest or other detention.

(e) *As used in this section, the term "confession" means any confession of guilt of any criminal offense or any self-incriminating statement made or given orally or in writing.* (Emphasis supplied).

cord an "in custody" suspect the following warnings: (a) that he has a constitutional right to remain silent; (b) that anything he does say can and will be used against him in court; (c) that he has a right to confer with counsel prior to answering any questions and to have counsel present during the questioning itself; and (d) that if he is indigent he has the right to have appointed counsel present. *Miranda* further provides that the defendant, after being so advised, may waive his rights if he does so knowingly and intelligently, but that he may nevertheless rescind the waiver at any time prior to or during the interrogation by stating that he wishes to remain silent altogether, or that he wishes to do so until an attorney is present. 384 U.S. at 473, 474, 86 S.Ct. 1602.

Section 3501, *supra*, provides that the presence or absence of any of the *Miranda* factors, together with consideration of the time between arrest and initial commitment proceedings, must be considered by the trial court prior to trial—with the same considerations to be thereafter independently considered and determined by the jury at trial—*in deciding the issue of voluntariness of the confession.* Should the judge determine, as here, that the confession was voluntarily given under the *totality* of all of the facts and circumstances, the confession is admitted in evidence and the Court at trial then submits to the jury, as here, the same question of voluntariness for independent jury determination.

We have held that voluntariness is the sole constitutional requisite governing the admission of a confession in evidence. United States v. McCormick, 468 F.2d 68 (10th Cir. 1972), cert. denied 410 U.S. 927, 93 S.Ct. 1361, 35 L.Ed.2d 588 (1973); United States v. Davis, 456 F.2d 1192 (10th Cir. 1972). We favorably referred in *Davis* to the provisions of 18 U.S.C.A. § 3501, equating those provisions with the "balancing test" announced in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

In United States v. Davis, *supra*, we noted that the United States Supreme Court had not ruled on the constitutionality of 18 U.S.C.A. § 3501 *supra*. We there observed that in Lego v. Twomey, Warden, *supra*, Mr. Justice White, writing for the majority, while holding that the statute was inapplicable to the state proceeding there under review, did nevertheless deem § 3501 "relevant to note."

Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), a 5–4 decision, held that a statement inadmissible against a defendant in the government's case in chief because of lack of the procedural safeguards set forth in *Miranda* may, if its trustworthiness satisfied legal standards, be used for impeachment purposes to attack the credibility of the defendant's trial testimony. The dissenters insisted that *Miranda* settled the proposition by holding that the privilege against self-incrimination protects the individual from being compelled to incriminate himself in *any* manner.

We believe that Michigan v. Tucker, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), although not involving the provisions of § 3501, *supra*, did, in effect, adopt and uphold the constitutionality of the provisions thereof. *Tucker, supra,* involved a pre-trial suppression hearing of an incriminating custodial interrogation which (just as in the instant case) did not involve threats, abuse or coercion by the police officers. The police interrogation was there in fact undertaken following each of the *Miranda* warnings except the advisement that *the accused had the right to the appointment of counsel if he was indigent.* The Court observed that the *Miranda* "suggested" safeguards were not intended to "create a constitutional straitjacket" notwithstanding the language in *Miranda* that statements made in violation of its principles *must not be used to prove the prosecution's case at trial.* The Court stated that without post-Miranda precedent of its own to guide it, the *totality of the facts and circumstances* evidenced that "There is plainly no reason to believe that Henderson's testimony is untrustworthy simply because *respondent*

was not advised of *his* right to appointed counsel." 417 U.S. at 449, 94 S.Ct. at 2366.

The majority deemed it significant to point out that it was not dealing with the offer of the defendant's own statement in evidence, but rather the testimony of witness Henderson whom the police discovered *only* as a result of the defendant's statement; still the Court recognized that Henderson's trial testimony had a devastating effect inasmuch as it completely contradicted Tucker's alibi defense, i. e., that at the time of the rape he was away from the scene in the company of Henderson, and further implicated Tucker by reason of remarks allegedly made to Henderson by Tucker directly related to the crime. We observe that *if* each of the *Miranda* warnings are constitutionally mandated under *any and all* circumstances, certainly the Court would have been hard pressed in permitting the admission of Henderson's testimony under the "fruit of the poisonous tree" doctrine first articulated in Silverthorne Lumber Company v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), and thereafter more fully developed in Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Mr. Justice Douglas, in his *Tucker, supra,* dissent, stated:

> The testimony of the witness in this case (Henderson) was no less a fruit of unconstitutional police action than the photographs in *Silverthorne* or the narcotics in *Wong Sun* . . . His testimony must be excluded to comply with *Miranda's* mandate that "no evidence obtained as a result of interrogation [not preceded by adequate warnings] can be used against" an accused.

417 U.S. at 464, 94 S.Ct. at 2374.

■■ We thus hold that the trial court did not err in applying the guidelines of § 3501, *supra,* in determining the issue of the voluntariness of Crocker's confession. We further hold that the record before us evidences full compliance with the *Miranda* mandates. There was no trial court error in the admission of the confession.

### III.

■■ Crocker was not taken before a magistrate or judge for purpose of appearance set forth under Rule 5(a), F.R. Crim.P. within a period of six hours as required under McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). The Congress, in the enactment of 18 U.S.C.A. § 3501(c) provided that non-compliance with the six hour rule does not automatically render inadmissible a confession obtained more than six hours after arrest. In the case at bar, the six hour rule comes into play in relation to the written confession executed by Crocker and witnessed by Agents Skiles and Clark, well beyond the six hour period following her arrest. This Court has held and now re-affirms the rule that such delay is simply a factor the trial judge must consider in determining voluntariness of a confession. We agree with the trial court's finding that the delay in the case at bar did not render Crocker's statement involuntary and that the Secret Service agents were diligent in their efforts to present Crocker before a magistrate or judge on November 13th, but that their efforts were not successful until the morning of November 14th. We have held that Section 3501(c), *supra,* is in keeping with the "balancing test" announced in Barker v. Wingo, *supra.* United States v. McCormick, *supra.*

### IV.

■ Crocker challenges the sufficiency of the evidence to sustain the conviction. She argues that in order to be guilty of the crime of conspiracy as charged, the Government must prove her guilty of the substantive crime of possessing and passing counterfeit money with the intent to defraud, pass, utter, publish, sell or keep in her possession or conceal, falsely made, counterfeited, forged or altered obligations of the Unit-

ed States. We agree. In order to sustain the position she urges upon us, Crocker rehashes her contention that her incriminating statement was erroneously admitted and that there is no direct evidence that the $10.00 bill she passed at the After Five Club was known by her to be counterfeit.

An appellate court must, following a conviction, view the evidence in the light most favorable to the Government to decide if there is substantial proof, direct or circumstantial, together with reasonable inferences to be drawn therefrom, from which a jury might find the appellant guilty beyond a reasonable doubt. United States v. Downen, 496 F.2d 314 (10th Cir. 1974); United States v. Yates, 470 F.2d 968 (10th Cir. 1972).

■ The essence of the crime of conspiracy is an agreement to violate the law. United States v. Butler, 494 F.2d 1246 (10th Cir. 1974); Carter v. United States, 333 F.2d 354 (10th Cir. 1964). And while the agreement need not take any particular form, there must be a meeting of the minds in the common design, purpose, or objects of the conspiracy. United States v. Butler, *supra.* The evaluation of evidence in a conspiracy trial is difficult because of the secretive nature of the crime and the reliance upon circumstantial evidence, together with the reasonable inferences to be drawn therefrom. United States v. Butler, *supra;* Leeper v. United States, 446 F.2d 281 (10th Cir. 1971), cert. denied 404 U.S. 1021, 92 S.Ct. 695, 30 L.Ed.2d 671 (1972).

A detailed review of the evidence supporting the jury conviction is not necessary. We deem these brief recitals to be relevant: (1) Crocker knew of the fact that the $10.00 bills possessed by Blankenship and Lambeth were counterfeit before the offense charged was committed; (2) Crocker was present on the evening of November 13th at several bars in Oklahoma City when Blankenship and/or Lambeth passed a number of counterfeit $10.00 bills and obtained change after each of the three ordered only one beer at each bar before departing the premises; (3) Crocker passed one of the counterfeit $10.00 bills given to her by Lambeth for cigarette change to assistant manager Hilger at the After Five Club; and (4) Crocker's statement contained a confession that she knew that the $10.00 bills being passed that evening by the three were counterfeit. These recitals evidence overt acts to further the conspiracy shown. To be sure, Crocker either denied or explained away her participation at trial. This, however, simply created an issue of credibility. It is fundamental that the credibility of witnesses is the exclusive function for determination by the jury as the trier of fact. United States v. Spoonhunter, 476 F.2d 1050 (10th Cir. 1973); United States v. Wheeler, 444 F.2d 385 (10th Cir. 1971); Bailey v. United States, 410 F.2d 1209 (10th Cir. 1969), cert. denied 396 U.S. 933, 90 S.Ct. 276, 24 L.Ed.2d 232 (1969).

■ Our analysis of the record leads to the conclusion that the evidence of appellant's guilt is so strong and persuasive that none of the contentions she has advanced merit or justify a different verdict. If any errors occurred, they were harmless. A defendant is not entitled to a perfect trial, but rather a fair trial. Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953). Crocker received a fair trial.

We affirm.