The UNITED STATES of America,
Plaintiff,

v.

Chris THORP, Defendant.

Crim. A. No. 80–CR–167.

United States District Court,
D. Colorado.

Sept. 25, 1980.

Jerome C. Ramsey, Asst. U. S. Atty., Denver, Colo., for plaintiff.

John S. Evangelisti, Denver, Colo., for defendant.

CARRIGAN, District Judge.

THIS MATTER is before the Court on a motion to suppress filed by defendant Chris D. Thorp,[1] an inmate of the Federal Correctional Institution at Englewood, Colorado. Thorp contends that certain self–incriminating statements he made to Internal Revenue Service special agents, during a prelimi-

---

1. Simultaneously with his filing of this motion, Thorp filed a motion seeking a polygraph examination in an effort to corroborate his contention that the statements he seeks to suppress are not true. That motion is rendered moot by this opinion.

nary investigatory interview, were involuntary because they were elicited by implied promises or threats.

■ "[I]t is firmly established that self–incriminating statements induced by promises or offers of leniency shall be regarded as involuntary and shall not be admitted into evidence for any purpose." *United States v. Powe*, 591 F.2d 833, 836 (D.C.Cir. 1978). The test for voluntariness is whether a statement "was 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" *Hutto v. Ross*, 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976), *quoting Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 186–87, 42 L.Ed. 568 (1897).

The foregoing test, however, "has never been applied with . . . wooden literalness . . . ." *United States v. Ferrara*, 377 F.2d 16, 17 (2d Cir. 1967), *cert. denied*, 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967). Rather, the "Supreme Court has consistently made clear that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of 'law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self–determined . . .'" *Id.* The United States Court of Appeals for the Tenth Circuit has applied this standard. *See, e. g., United States v. Fritz*, 580 F.2d 370, 377 (10th Cir. 1978), *cert. denied*, 439 U.S. 947, 99 S.Ct. 340, 58 L.Ed.2d 338 (the test of voluntariness is whether the incriminating statements were "in any way coerced so as not to be the product of the free, independent will of the confessor").

■ At the time the special agents interviewed Thorp regarding his involvement in the tax fraud scheme alleged in this case, Thorp had been incarcerated in an isolation cell for more than a month. He had been thus isolated at his own request, for his personal safety, because he had been sexually harassed by other inmates. He had pending a request for transfer to another institution. Thorp believed that such a transfer would eliminate the problems with other prisoners, and he had been informed unofficially by prison authorities that his transfer had been or would be approved, and that it was "just a matter of time" before the warden finalized its approval. Moreover, he had been told that he would be transferred to the Class I institution at Morgantown, Virginia. There he would have more privileges and far greater freedom than at Englewood, a Class III facility. He believed that the inmates at Morgantown would not harass him sexually for fear of their being transferred to other, less desirable, institutions. Thus his desire for prompt transfer was indeed compelling.

At the time of the interview, the IRS agents were fully aware of Thorp's status at FCI Englewood, and of his pending transfer request. Thus, they knew that they were interviewing an inmate who had asked to be placed in isolation for his own protection, and who was hoping for relatively prompt relief from the Hobson's choice between spending nearly twenty–four hours a day in a locked isolation cell or enduring sexual harassment from fellow prisoners. It is also undisputed that, at some point during the interview, the subject of the transfer request was discussed. Thus, Thorp knew that the agents were fully aware of his status.

Thorp appears to be a young, soft spoken, insecure person. He has a tenth grade education. At the hearing, it became obvious that Thorp was easily led, suggestible, and susceptible to being influenced by the attitudes of those questioning him. The government agents testified that he appeared the same when they questioned him as at this hearing.

The agents initially advised Thorp of his rights, and obtained his signature on a written waiver form. Thorp never affirmatively indicated during the interview that he did not want to talk to the agents, nor did he request an attorney. Therefore, viewing those facts alone, a lack of voluntariness is not apparent.

Thorp initially denied any participation in or knowledge of the income tax fraud scheme. After he had persisted in that position for some time, the agents admittedly told him–at the least–that if he "cooperated" with them in their investigation, they would report his cooperation to the United States Attorney *and* to prison officials. Thorp testified, in addition, that one of the agents suggested that if Thorp did *not* cooperate, the investigation could take longer and Thorp's transfer might have to be delayed while the investigation proceeded so that he could be kept available for further interviews.

█ Even assuming that the agents' more limited version of their attempts to persuade Thorp to cooperate is true, in the circumstances presented here, such implied promises went beyond the bounds of permissible investigatory tactics.

The agents were presented with a person of a weak, suggestible nature in a situation most likely to render him susceptible to even subtle promises or threats. In addition to the inherently coercive atmosphere of the prison, Thorp's lengthy isolation, and his fear of renewed sexual harassment by fellow prisoners no doubt placed him at a disadvantage, psychologically, in dealing with the agents. Considering his fear that his tenuously tentative transfer might be lost by not cooperating, it seems likely that Thorp would have told the agents whatever he thought they wanted to hear in order to avoid jeopardizing his transfer. The fact that Thorp has asked for a polygraph examination in an attempt to demonstrate that his statement thus obtained is not true indicates that he and his counsel seek suppression not only because of involuntariness but also because of untruth.

For the agents to suggest, even implicitly, that they could–and would–attempt to influence those prison officials who completely controlled Thorp's fate, was to exert an impermissible influence over his free will. Even if the agents only told Thorp that they would inform the officials should he choose to cooperate, the obvious implication was that those officials probably would also be informed if he did not. In particular circumstances of this case, that type of coercion was sufficiently strong to justify applying the exclusionary rule. The courts cannot condone, or seem to approve, tactics such as employed by these agents, even if well intended. More importantly, the methods used cast strong doubts on the reliability and credibility of the statements elicited.

The Court is well aware that a "promise merely to bring any cooperation on the part of the defendant to the prosecuting attorney's attention does not constitute a coercive promise sufficient to render any subsequent statements involuntary and inadmissible." *United States v. Fera*, 616 F.2d 590, 594 (1st Cir. 1980), and cases cited therein. Here, however, in this setting, considering this defendant's personality and special vulnerability, the implicit promises or threats went far beyond the scope of that general rule. The agents' statement to Thorp that his cooperation would be reported to prison officials as well as the prosecuting attorney plainly applied powerful emotional pressure considering his overriding desire to be transferred, his weakened psychological condition following protracted isolation, and his belief that the prison officials who would be pleased to hear of his cooperation held power to approve or disapprove his transfer. It is notable that one of the agents admitted that while she "routinely" stated that cooperation would be reported to prosecuting attorneys, such reports to prison officials were not routine.

The combined circumstances lead this Court to find that the statements at issue were not products of the defendant's free, independent will.

The motion to suppress is GRANTED.