UNITED STATES of America, Appellee,

v.

Robert Earl FRITZ, Appellant.

No. 77–1027.

United States Court of Appeals,
Tenth Circuit.

Submitted En Banc May 9, 1978.

Decided July 3, 1978.

Douglas B. Comer, Asst. U. S. Atty., Topeka, Kan., and Jerome Feit, Deputy Chief, App. Section, Dept. of Justice, Crim. Div., Washington, D. C., for appellee.

David J. Phillips, Asst. Federal Public Defender, Kansas City, Kan., for appellant.

Before SETH, Chief Judge, and HOLLOWAY, McWILLIAMS, BARRETT, DOYLE, McKAY and LOGAN, Circuit Judges.

BARRETT, Circuit Judge.

Robert Earl Fritz (Fritz) appeals from a jury verdict of guilty and subsequent sentencing following trial on a two-count indictment charging that on July 27, 1976, he (1) wilfully and knowingly transported one Rick Lee Simpson in interstate commerce from Kansas to Iowa after having kidnapped him for ransom, in violation of 18 U.S.C.A. § 1201, and (2) wilfully and knowingly transported in interstate commerce a certain 1964 Ford pickup truck knowing it was stolen, in violation of 18 U.S.C.A. § 2312.

We will summarize the evidence, keeping in mind that following a conviction the evidence on appeal must be reviewed in the light most favorable to the Government together with all reasonable inferences to be drawn therefrom. *United States v. Crocker*, 510 F.2d 1129 (10th Cir. 1975); *United States v. Yates*, 470 F.2d 968 (10th Cir. 1972).

On or about July 27, 1976, Fritz, then a prisoner at the Kansas State Penitentiary, was transferred to a hospital in Leavenworth, Kansas, because of an apparent illness. One Riggs, an employee of the penitentiary, had been assigned to guard Fritz while Fritz was in the hospital. While standing guard outside of Fritz's hospital room about 1:00 o'clock A.M. on July 27, 1976, Fritz overpowered Riggs, ran from the room and escaped.

One Rick Lee Simpson, age 16, testified that about 7:00 P.M. on July 27, 1976, he had gone to a fishing pond in Leavenworth after parking his pickup truck nearby. When he returned to his vehicle he found Fritz seated therein on the passenger side. Fritz ordered Rick to get in and he directed that Rick drive onto Highway 73. Rick was "scared" because he saw that Fritz had in his possession a hay bale hook, an axe and a baseball bat. Furthermore, Rick was concerned that Fritz had a gun under the front seat. Rick was afraid. He did not know whether to run or do as directed. He got into the truck and drove onto Highway 73 where Fritz told him to drive north on Highway 73. Fritz ordered Rick to stop in Atchison, Kansas, and to pick up a coke for him at a Dairy Queen. Rick obeyed. When asked on direct examination why he did not attempt to escape at that time, Rick responded that he did not know how the people in the Dairy Queen would respond if he told them he had a person in his truck making him drive him "some places" and he

was fearful of his life because he still did not know whether Fritz had a gun and whether ". . . he would have shot me just then or not." [R., Vol. II, at 23.] Rick proceeded to transport Fritz, as directed, for a period in excess of two hours until they arrived in Nebraska City, Nebraska, where they stopped to get gasoline. Fritz then admonished Rick not to "try anything." [R., Vol. II, at 24.] They then traveled to Sidney, Iowa, as ordered by Fritz, where Fritz departed from the truck on a side road of the highway after taking Rick's shoes and socks. He also departed with two baseball batting gloves and a "sawed-off" baseball bat, which were identified by Rick in open court together with his tennis shoes and socks, all of which were admitted in evidence. Rick testified that during the end of the trip Fritz told him that he had escaped from the hospital in Lansing; that he "belonged" in the Kansas State Penitentiary; that his name was "Bob"; that he had "faked" a heart attack to get into the hospital in Leavenworth; that he had a handcuff key underneath his false teeth (which he displayed to Rick) which he had been using for "the past two years to get out of all the prisons." Rick tried to contact police while attempting to drive back to Leavenworth late that night. He finally related the events to a highway patrolman in St. Joseph, Missouri. [R., Vol. II, at 29–32.]

Rick identified Fritz in open court as the person who forced him to undertake the involuntary journey. On cross-examination, Rick testified that he was in the eleventh grade at Leavenworth High School where he played basketball; that he stood 6 feet 5 inches and weighed 175 pounds; and that he believed he was in good physical shape. [R., Vol. II, at 33, 34.] Rick acknowledged that Fritz did not use any threatening language directed toward him. Even so, Fritz shook a hay bale hook at Rick when he first ordered him to drive north, and later Fritz remarked to Rick that if he had not "gotten in the truck he would have killed me with that hay bale hook." [R., Vol. II, at 44.] Rick stated that he did not relate his predicament to anyone at the

Dairy Queen (which he entered twice) because he did not feel that anyone would believe him. Furthermore, Rick did not see a second door inside the Dairy Queen. In any event, Rick was fearful that Fritz had a gun in his possession. [R., Vol. II, at 45.] Rick said that he asked Fritz two or three times whether Fritz intended to hurt him and that Fritz said he did not. [R., Vol. II, at 49.] The 16-year old Rick testified that he was "scared" and that even after Fritz left the pickup truck in Sidney, Iowa, Rick wanted to find help. [R., Vol. II, at 57.]

George C. Scott, a Missouri State Highway Patrolman, testified that he had been informed by radio about a red pickup truck whose driver had been "robbed" and that he stopped a truck meeting that description being driven by Rick about 5:38 A.M. on July 28, 1976, north of St. Joseph, Missouri. [R., Vol. II, at 61–64.] Rick told Scott that he had been kidnapped, forced to take a man to Iowa and that he had been robbed. [R., Vol. II, at 64.] Scott observed that Rick was nervous and that he appeared frightened. [R., Vol. II, at 64.]

Steve MacDonald, Chief of Police, Sidney, Iowa, testified that he arrested Fritz in Sidney during the morning of July 28, 1976. He identified Fritz in the courtroom, together with the exhibits representing the gloves, the tennis shoes, the pair of baseball gloves and the handcuff key. After another officer arrived at the scene where Chief MacDonald had stopped Fritz, MacDonald testified that ". . . we questioned him [Fritz] quite a bit out there and Officer Brumbaugh had heard of the escape of a Kansas inmate on AM Radio WOW, Omaha. He remembered the Fritz case. He is from Nebraska and he remembered when this Robert Fritz had an earlier spree . . ." [R., Vol. II, at 76.] Upon defense objection, the trial court admonished the jury to disregard the statement about the escape and spree. Fritz's motion for mistrial was then overruled. [R., Vol. II, at 77.]

MacDonald stated that a teletype communication from Kansas authorities was received describing one Robert Earl Fritz, an escapee from Kansas, and that Fritz met

the detailed description. Fritz was then taken to the Fremont County Jail in Sidney, Iowa. It was there that Fritz faked a heart attack. MacDonald testified that when Fritz was being returned to jail following the ambulance trip and medical examination, he remarked to MacDonald that "I thought you guys were a bunch of softies and I could put something over on you" and that "I don't have nothing to lose . . . I have been in jail most of my life." [R., Vol. II, at 83–85.] The trial court sustained defense objection to this testimony and admonished the jury to disregard it. The trial court, however, denied the defense motion for mistrial.

James C. Brumbaugh, State of Iowa Highway Patrolman, corroborated much of MacDonald's testimony.

Dr. Walter G. Nelson, who was called to the Sidney, Iowa, County Jail after Fritz complained of chest pains on July 28, 1976, testified that he found Fritz, whom he identified in open court, "complaining of pain and was making all kinds of motions with his body, folding his body up . . . holding his chest and folding over." He examined him for a possible heart attack. Dr. Nelson's examination did not indicate that Fritz was suffering heart problems but, out of precaution, he administered a shot of Arlidin to improve his heart rate. The purpose of the drug, in addition to improving the heart rate, is that of stimulating the blood supply to the brain. Dr. Nelson stated that this would also stimulate the brain and cause the patient to think better because more blood would flow to the brain.

Dr. Kenneth D. Rodabaugh, of Tabor, Iowa, testified that he examined an electrocardiogram taken of Fritz at Grape Community Hospital. The doctor remembered Fritz by his fictitious name of John Staggerwald. He found Fritz's blood rate and rhythm normal and regular, lungs clear and reflexes normal with only dilated pupils, probably due to fear or anxiety. He confirmed Dr. Nelson's opinion concerning the effect of the shot of Arlidin administered Fritz.

Jerald W. Gallentine, Special Agent with the FBI, testified that on July 28, 1976, he left his Omaha, Nebraska, office and traveled to Sidney, Iowa, after notification that an escapee from Leavenworth had been apprehended in Sidney. He and Special Agent James P. Malone proceeded to the Grape Community Hospital where they interviewed Fritz after identifying themselves and after tendering Fritz a printed "Miranda" statement of his rights. Fritz declined to physically take the card in his hands and to read it. Thereupon, Agent Gallentine read the rights to Fritz, to-wit: "Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer." [R., Vol. II, at 162–166.] After reading these rights to Fritz, Agent Gallentine stated that Fritz remarked "Yes, yes, I know all about my rights," that he understood them but he declined to sign the so-called "waiver" of rights form on the bottom of the printed statement. [R., Vol. II, at 126.] The FBI agents thereupon proceeded to interview Fritz. They found him to be alert and without sign of pain. Fritz stated that John Henry Staggerwald was his given name but that after his adoption his name had been changed to Earl Fritz. Fritz remarked that "by means of fear" he had forced Rick Simpson to drive him from Leavenworth, Kansas, to Sidney, Iowa, "for fear of bodily harm and of losing his pickup truck." [R., Vol. II, at 167.] Agent Gallentine recalled Fritz remarking that he should have killed young Simpson. [R., Vol. II, at 168.]

Fritz's fingerprints were traced to Rick's pickup truck by an FBI fingerprint expert. [R., Vol. II, at 179–180, 189.]

Fritz did not testify nor did he present any evidence. Prior to trial, Fritz moved to dismiss the indictment on the ground that the Government had not complied with the Department of Justice policy regarding prosecution of individuals previously tried in state court for offenses involving the same acts. [R., Vol. IV, at 4.] This motion, after hearing, was denied. [R., Vol. IV, at 8.] In this regard the facts established that Fritz had been prosecuted in Kansas state court on one count of Escape, two counts of Burglary and one count of Aggravated Robbery. [R., Vol. III, at 3.] The Escape charge related to his departure from the hospital room in Leavenworth where he had been confined by Kansas State Penitentiary officials. One of the Burglary counts related to Fritz's entry of Rick's pickup truck. The Aggravated Robbery count involved Fritz's taking of Rick's property. Fritz entered a guilty plea in state District Court of Leavenworth County, Kansas, on October 6, 1976, to the Escape and Burglary charges following plea negotiations. The Aggravated Robbery charge was dismissed. The State of Kansas agreed, as part of the plea bargaining, not to invoke the Habitual Criminal Act. However, at no time was mention or reference made that Fritz would not be subject to federal prosecution. [R., Vol. III, at 4, 5.]

Prior to trial, Fritz moved to suppress the statements made by him to FBI Agents. The motion was heard during trial out of the presence of the jury. [R., Vol. IV, at 8.] The trial court denied the motion, finding that Fritz had been advised of his rights against self-incrimination, that he had voluntarily waived them and that the statements were admissible. [R., Vol. II, at 101–138.] The facts relating to the circumstances of Fritz's statements thereafter admitted in evidence for consideration by the jury are in essence identical to those considered by the trial court during the proceedings had on the motion. [R., Vol. II, at 124, 126, 127, 128, 129, 132.]

On appeal, Fritz contends that the trial court erred in: (1) overruling his motion to dismiss the indictment in that the instant federal prosecution does not conform to De-partment of Justice policy regarding the prosecution of individuals previously tried in state court for offenses involving the same acts, (2) overruling his motions for mistrial based upon the prejudicial statements of a police officer, (3) overruling his motion to suppress his statement made to the two FBI agents, (4) refusing to give his requested instruction relating to his "theory of the case," and (5) overruling his motion for judgment of acquittal at the conclusion of the Government's evidence in that it was insufficient to justify the jury verdict.

I.

Fritz alleges that the trial court erred in denying his motion to dismiss the indictment on the ground that it did not conform to the Department of Justice policy regarding the prosecution of individuals previously tried in state court for offenses involving the same acts. We disagree.

Fritz contends that the so-called "Petite Policy" of the Department of Justice dictated dismissal of the indictment in order to protect individuals from being twice tried for "offenses involving the same acts." [R., Vol. IV, at 10.] There is no dispute relative to the policy contained in a 1972 manual published for United States Attorneys: "It is department policy that after a state prosecution there should be no federal trial for the same act or acts unless there are compelling federal interests involved, in which case prior authorization should be obtained." [R., Vol. III, at 12.] In light of the Government's acknowledgment that the state and federal offenses charged against Fritz arose out of the same general transaction [R., Vol. III, at 14.], Fritz contends that failure of the United States Attorney to obtain prior consent from the Department of Justice to prosecute him was violative of the Department policy, thus requiring dismissal. There is no dispute that the United States Attorney did not seek prior approval from the Department of Justice before proceeding against Fritz. [R., Vol. III, at 17.]

Fritz concedes that the "Petite Policy" is an internal policy of the Department of

Justice. Even so, he argues that the courts should enforce it just as they would a binding rule of law.

In *U. S. v. Thompson*, 10 Cir., —— F.2d ——, the majority opinion of this court held that the "Petite Policy," whose origin is traced to *Petite v. United States*, 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960), did not confer any right upon defendant Thompson in that it is an ". . . ill-founded . . . notion that a departmental policy such as . . . [Petite] . . . is capable of giving rise to an enforceable right in favor of the defendant." Neither in *Thompson* nor here was any serious or genuine Double Jeopardy contention made.

Thus, in *Thompson*, the majority opinion held that, (a) the "Petite Policy" cannot be applied in favor of a defendant over the objections of the government and that, in any event, (b) the "Petite Policy" is ". . . at most a guide for the use of the Attorney General and the United States Attorneys in the field." We concluded that the internal "housekeeping" rule of the Department was incapable of conferring a right upon the accused. The dissenting opinion, with particular reliance upon *Rinaldi v. United States*, 434 U.S. 22, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977), would hold that the "Petite Policy" is a binding agency policy upon which "the public has a right to rely . . . as against some inconsistent case by case subjective determination by a public official," and that the policy ". . . is so much a part of the decisions formulating the dual jeopardy as a protection to the defendant that it must be available to the defendant Thompson."

■ For the reasons so fully set forth in the majority opinion in *Thompson, supra*, we must reject Fritz's contention that he has a right to challenge the instant prosecution on the ground that it was undertaken in violation of the Department of Justice' "Petite Policy." *See also United States v. Nelligan*, 573 F.2d 251 (5th Cir., 1978), where the court stated that ". . . it is apparent that the Petite Policy is intended to be no more than self-regulation on the part of the Department of Justice. The court in *Rinaldi* emphasized that although fairness is served by avoiding unnecessary prosecutions, the Constitution does not prohibit successive state-federal prosecutions. . . . The Supreme Court has never compelled the dismissal of a prosecution pursuant to the *Petite* policy over the objections of a recalcitrant Department of Justice. This court has recognized that *Petite* is an internal policy of self-restraint that should not be enforced against the government." [1]

## II.

Fritz contends that the trial court erred in denying his motions for mistrial based upon alleged prejudicial statements made by Chief of Police Steve MacDonald. One involved MacDonald's remark that when he and Brumbaugh first questioned Fritz that a message came over the AM radio about a Kansas inmate's escape and that Brumbaugh ". . . remembered the Fritz case. He is from Nebraska and he remembered when this Robert Fritz had an earlier spree . . . ." [R., Vol. II, at 76.] MacDonald also testified about Fritz's remarks, while enroute back to the county jail from the hospital, that he [Fritz] had nothing to lose and had been in jail most of his life. [R., Vol. II, at 85.] The trial court sustained defense counsel's objection to each statement and admonished the jury to dis-

1. Judge Barrett would further hold that the "Petite Policy" is inapplicable in *Fritz* because there are strikingly different *acts* as well as *offenses* involved in the state and federal prosecutions arising, to be sure, from the same general transaction, i. e., Fritz's escape from the Leavenworth, Kansas, hospital and his subsequent arrest in Sidney, Iowa. Even though the Government conceded at oral argument that *Petite* applies to all acts in Fritz apparently predicated on the "same transaction" proposition, I submit that there is nothing "substantially identical" between the "acts" and "offenses" involving state prosecution of Fritz involving Escape from Lawful Custody, Burglary of a Vehicle, Robbery and Theft and federal prosecution for having wilfully and knowingly transported Rick Lee Simpson in interstate commerce from Kansas to Iowa after having kidnapped him for ransom.

regard the first statement. The court, however, denied Fritz's motions for mistrial. [R., Vol. II, at 86.]

(a)

After the trial court sustained objection to the first statement, i. e., re the "earlier spree," the Court admonished the jury to disregard it. After the second challenged statement was testified to, i. e., "nothing to lose" and "jail most of my life," the trial court sustained Fritz's objection thereto and immediately thereafter, counsel for Fritz approached the bench and there moved for a mistrial, which, after considerable colloquy, was denied. It is clear, we believe, that the trial court was effectively distracted from admonishing the jury to disregard the second statement when its attention was directed exclusively to Fritz's motion for mistrial.

The trial court meticulously instructed the jury on the alleged prejudicial statements made by Chief MacDonald:

As you have already been cautioned, there has been evidence presented relating to the escape of the defendant from the custody of a Grand Jury while in the Cushing Hospital at Leavenworth. Such evidence, of course, relates to possible unlawful acts and conducts of the defendant other than the specific offenses with which he is charged and is on trial. You are instructed that this evidence has been admitted only for the limited purpose of showing guilty knowledge, intent, preparation, plan and identity of the defendant with respect to the offenses charged. Such evidence of other unlawful acts may not be considered by you as proof that the defendant is guilty of the offenses charged, but is relevant and may be considered by you only for the limited purpose I have just stated. [R., Vol. II, at 216, 217.]

\* \* \* \* \* \*

The defendant is on trial only for the acts alleged in the indictment. He is not on trial for any other act or conduct. In determining whether the defendant is guilty or innocent, you are, therefore, to consider only whether he has or has not committed the acts charged in the indictment. Even if you are of the opinion that the defendant is guilty of some offense not charged in the indictment, you must find him "not guilty" if the evidence does not show beyond a reasonable doubt that he has committed the specific acts charged in the indictment. [R., Vol. II, at 217.]

Any evidence as to which an objection was sustained by the court, and any evidence ordered stricken by the court, must be entirely disregarded. Anything you may have seen or heard outside the courtroom is not evidence, and must be entirely disregarded. [R., Vol. II, at 219.]

■ The first statement objected to was stricken and the court admonished the jury to disregard it. While the statement was hearsay, it was a statement of identification and thus admissible in that respect. The trial court did not err in admitting the identification portion of the declarant's statement: "His answer . . . that he [Brumbaugh] remembered him will stand . . . ." [R., Vol. II, at 76.] *See*, Fed.R. Evid. 801(d)(1)(C); 71 A.L.R.2d 448, §§ 4, 16, 19. We deem it significant that when Brumbaugh testified, he was not cross-examined by counsel for Fritz relative to Brumbaugh's recollection of Fritz.

■ We believe that the only contention of import involving alleged prejudice relates to Chief MacDonald's statement that Officer Brumbaugh knew Fritz from "an earlier spree." In light of the overwhelming evidence of Fritz's guilt, we hold that the assertion that MacDonald's reference to "an earlier spree" was so prejudicial as to deny Fritz a fair trial is without merit. The statement could not have had any appreciable effect on the jury's action nor could it have significantly interfered with Fritz's rights when viewed against the totality of the overwhelming evidence of his guilt. *United States v. Woodring*, 446 F.2d 733 (10th Cir. 1971).

### (b)

■ We now consider the claim of prejudicial error in the admission of Fritz's statements that "I don't have nothing to lose" and "I have been in jail most of my life." The trial court found that Fritz had been properly and adequately given the *Miranda* warnings while he was in the hospital. [R., Vol. II, at 162–176.] We agree. The record is clear that the statements made by Fritz were not only made after he had been fully informed and when he understood his *Miranda* rights but that they constituted spontaneous utterances which were not the result of the interrogation. These statements were made by Fritz while he was enroute from the hospital back to the county jail, in close proximity to the time the FBI agents had given him the *Miranda* warnings. Even so, the trial court sustained Fritz's objection thereto and admonished the jury to disregard these utterances. We believe that these statements were relevant to show Fritz's motive, intent, plan and absence of mistake. *United States v. Freeman*, 514 F.2d 1184 (10th Cir. 1975); *United States v. Parker*, 469 F.2d 884 (10th Cir. 1972). Fed.Rules Evid.Rule 404(b), 28 U.S. C.A.

### III.

Fritz argues that the trial court erred in overruling his motion to suppress his statement made to the FBI agents on the ground that he had not voluntarily waived his right against self-incrimination.

Fritz contends that the record does not reflect that he knowingly and intelligently waived his privilege against self-incrimination before making the oral statements following interrogation by FBI Agent Gallentine at the Grape Community Hospital. While conceding that the record reflects that he was adequately advised of his rights and that he understood them (Brief of Appellant, p. 13.), Fritz nevertheless contends that he did not affirmatively waive his rights as found by the trial court. We disagree.

Fritz points to the language in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) that a "heavy burden" rests on the Government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.

The trial court conducted the suppression hearing initially, of course, out of the presence of the jury. Based upon the evidence and all of the circumstances, the trial court found that Fritz had been fully advised of his *Miranda* rights, that he fully understood them and that ". . . he freely, voluntarily, knowingly and intelligently waived his right to remain silent . . . his right to counsel . . . that there was no physical or mental pressure or coercion . . . that he was not in any way under the influence of the drug previously administered by the doctor . . . and . . he was not in any physical distress to the extent that he could not freely and voluntarily give a statement." [R., Vol. II, at 136, 137.] We agree. In charging the jury the trial court meticulously instructed that unless the jury was convinced beyond a reasonable doubt based upon all of the evidence that Fritz's incriminating statement was voluntarily and intentionally made, it was to be disregarded in its entirety. [R., Vol. II, at 215, 216.]

The sole issue presented here, then, is that of Fritz's knowing and intelligent waiver of his right against self-incrimination. When properly advised of his rights, Fritz stated that he understood them. Even so, he contends that they were in fact involuntarily made.

■ This court has consistently held, under circumstances such as those reflected by this record, that the test of voluntariness is whether the incriminating statements were "in any way coerced so as not to be the product of the free, independent will of the confessor." *United States v. Brown*, 540 F.2d 1048 (10th Cir. 1976), *cert. denied*, 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 549 (1977); *Bell v. Patterson*, 402 F.2d 394 (10th Cir. 1968), *cert. denied*, 403 U.S. 955, 91 S.Ct. 2279, 29 L.Ed.2d 865 (1971). *See also:*

*Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *Blackburn v. Alabama*, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). We find nothing in this record which indicates that Fritz's statements were not made knowingly, intelligently and voluntarily. The Government met its burden of proof that Fritz voluntarily waived his constitutional privilege against self-incrimination. *United States v. Crocker, supra; United States v. Tafoya*, 459 F.2d 424 (10th Cir. 1972); *Nolan v. United States*, 423 F.2d 1031 (10th Cir. 1969), *cert. denied*, 400 U.S. 848, 91 S.Ct. 47, 27 L.Ed.2d 85 (1970); 18 U.S.C.A. § 3501.

### IV. and V.

Fritz alleges trial court error in refusing to give his requested instruction relating to his "theory of the case" and in overruling his motions for acquittal at the conclusion of the Government's evidence for want of sufficient evidence. We hold that these contentions are without merit.

Fritz's proposed instruction relative to his "theory of the case" stated: "The involuntariness of seizure and detention is the very essence of the crime of kidnapping. Consent is a complete defense to such a charge. Therefore, if you find that Rick Lee Simpson either volunteered or consented to accompany the defendant, you must find the defendant not guilty." [R., Vol. IV, at 10.]

In lieu of the instruction requested by Fritz, the trial court instructed: "Involuntariness or coercion in connection with a victim's seizure and detention is an essential element of the crime charged; it must also be done with a wilful intent to confine the victim's freedom of movement and it may be achieved by mental, as well as physical means." [R., Vol. II, at 211.]

■ Fritz argues, peripherally at least, that even though Rick testified he was scared and drove Fritz to Iowa out of fear for his life, that nevertheless there was some evidence to indicate that Rick may have consented to accompany Fritz. We hold that the evidence simply does not support the giving of Fritz's tendered instruction. However, the instruction given by the trial court relative to the need to find that an alleged kidnap victim did not voluntarily accompany the party accused effectively covered Fritz's requested instruction. Thus, the trial court complied with the rule that a defendant is entitled to instructions on any theory of defense finding support in the evidence and the law. *United States v. Swallow*, 511 F.2d 514 (10th Cir. 1975), *cert. denied*, 423 U.S. 845, 96 S.Ct. 82, 46 L.Ed.2d 66 (1975).

■ Finally, we hold that there is no merit in Fritz's contention that there was insufficient evidence to support the jury's verdict. The evidence of Fritz's guilt is strong, persuasive and overwhelming.

■ If any errors occurred in the course of trial, certainly they were harmless. A defendant is not entitled to a perfect trial, but rather a fair trial. *Lutwak v. United States*, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953). Fritz received a fair trial.

WE AFFIRM.

LOGAN, Circuit Judge, dissenting, with whom SETH, Chief Judge, and McKAY, Circuit Judge, join.

I cannot concur in Part I of the Court's opinion, for the reasons stated in the dissent of Chief Judge Seth in *United States v. Thompson*, 579 F.2d 1184 (10th Cir. 1978). Prior to trial defendant Fritz moved to dismiss the indictment on the ground that the government had not complied with the requirements of the *Petite* policy. R. Vol. IV at 4. The prosecuting attorneys did not receive authorization from the Attorney General to proceed under that policy until a few days before the first oral argument in this Court, long after briefs were filed asserting that such permission was not needed.

The convictions in federal court were for transporting a stolen vehicle in interstate commerce and kidnapping its owner. Fritz entered a guilty plea in the Kansas state court to charges of escape and two counts of burglary. A fourth charge, of aggravated robbery, was dropped in return for the

guilty plea. These are different crimes and separate acts. The appellee's brief, pp. 12–13, states their relationship from the government's view:

About the only thing that can be said in the defendant's favor on the double jeopardy issue is that the crimes he committed arose out of the same criminal episode and followed one another heel and toe. But, they did not overlap and were separate and distinct acts and crimes. From the record made in the District Court the cronology [sic] of the violations appears to be as follows:

(1) Escape from lawful custody, in violation of K.S.A. 21–3810(a);

(2) Burglary of a building (1709 Quincy, Leavenworth, Kansas), in violation of K.S.A. 21–3715;

(3) Burglary of a vehicle (a 1964 Ford ½ ton Pickup truck), in violation of K.S.A. 21–3715;

(4) Robbery of Rick L. Simpson while armed with a dangerous weapon, in violation of K.S.A. 21–3427;

(5) Theft of Simpson's 1964 Ford ½ ton Pickup truck (obtaining control over it by threat), in violation of K.S.A. 21–3701(c), [A crime committed by defendant but not charged by either sovereign.];

(6) Transportation in interstate commerce of stolen motor vehicle, in violation of 18 U.S.C. § 2312;

(7) Kidnapping in violation of 18 U.S.C. § 1201.

As indicated, the first four were charged in state court. Obviously theft of the pickup and kidnapping could have been charged under Kansas law as they are state crimes, K.S.A. 21–3420 and 21–3701(c), and the acts occurred in Leavenworth, Kansas.

Government's counsel at the *en banc* hearing admitted to the court that the *Petite* policy applies not only to prosecutions for the same act or acts but to prosecutions arising out of the same "transaction," which I construed as being used in the sense of the "episode" here involved. This seems to be recognized in *Rinaldi v. United States*, 434 U.S. 22, 98 S.Ct. 81, 82 n. 5, 54 L.Ed.2d 207 (1977):

5. The *Petite* policy is most frequently applied against duplicating federal-state prosecutions. As stated by the Department of Justice, under that policy a federal trial following a state prosecution or [sic] *the same act or acts* is barred "unless the reasons are compelling." A United States Attorney contemplating a federal prosecution in these circumstances is required to obtain authorization from an appropriate Assistant Attorney General. In this case, the Justice Department official who instructed trial counsel to insist upon a retrial had not obtained the requisite approval.

But as the *Petite* case itself illustrates, the policy also encompasses successive federal prosecutions *arising out of the same transaction*. In that case, the Solicitor General represented "that it is the general policy of the Federal Government 'that *several offenses arising out of a single transaction should be alleged and tried together and should not be made the basis of multiple prosecutions*, a policy dictated by considerations both of fairness to defendants and of efficient and orderly law enforcement.' The Solicitor General on behalf of the Government represents this policy as closely related to that against duplicating federal-state prosecutions, which was formally defined by the Attorney General of the United States in a memorandum to the United States Attorneys. (Department of Justice Press Release, Apr. 6, 1959)." 361 U.S. [529], at 530–531, 80 S.Ct. [490], at 451 [4 L.Ed.2d 490]. [Emphasis supplied.]

I believe the *Petite* policy was intended to apply to the situation we have here, where there might be different acts, but there is transactional continuity and the same victims and property are involved in both the state and federal prosecutions. Such a finding does not preclude the federal authorities from prosecuting for kidnapping, as here, when state officials did not charge it in state court. It merely requires that the Attorney General's Office consider, before prosecuting, whether there is a com-

pelling reason to do so, considering both questions of fairness to defendant and the desirability of efficient and orderly law enforcement.