George DAVIS, Appellant,

v.

UNITED STATES, Appellee.

No. 90–CF–818.

District of Columbia Court of Appeals.

Argued April 21, 1992.
Decided Aug. 18, 1992.

Vincent A. Jankoski, Washington, D.C., appointed by this court, for appellant.

Robert A. De La Cruz, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Thomas J. Tourish, Jr. and Normal Paul Patterson, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, and FERREN and SULLIVAN, Associate Judges.

ROGERS, Chief Judge:

Appellant George Davis appeals his conviction by a jury of kidnapping on the principal grounds that there was an insufficient instruction on consent and insufficient evidence of kidnapping. We affirm.

I

The government's evidence showed that at approximately 8:30 p.m., on October 16, 1989, the complainant walked down 13th Street, N.W., on her way to a friend's home. As she passed the Davis home at 5712 13th Street, N.W., the complainant encountered Michael Lucas, whom she knew from the neighborhood, and stopped to speak to him. A few moments later, they were joined by appellant and the complainant told him that she was interested in renting a room, but that she was on her way to a friend's house. Appellant told her that she could rent a room from his sister, and to "stop by and see the room" on her way back. The complainant then continued on to her friend's house and stayed there until approximately 9:30 p.m.

When the complainant returned to 5712 13th Street, N.W., she again saw appellant and Michael Lucas. Appellant asked the complainant whether she wanted to see the room. She agreed, and followed appellant into his house and upstairs into a bedroom. Several other men also entered the room, and one of them asked appellant why he was trying to give his room to the complainant. The other men then left, closing the door behind them, but appellant told the complainant that she could not leave yet and asked her to remove her clothes. When she refused, he pushed her onto the

bed and called to his brother, William, "William, come here, * * * Man, help me get her clothes off of her." William came into the room and helped appellant forcibly undress the complainant.[1] Thereafter, according to the complainant, appellant touched her all over while she kept asking him to leave her alone; she screamed a couple of times. Finally, appellant told her he was tired of her "sniffling and crying" and that she could go home. He called his brother, William, to find the complainant's clothes, and told Michael Lucas to walk the complainant home.

When the complainant arrived home, she told her boyfriend what had happened and he called the police. The complainant told the police that she had been dragged into the house and raped. She accompanied the police back to appellant's house. Appellant answered the door, and the complainant identified him, his brother, William, and another man as the men who were involved in the assault.

Appellant was indicted along with his brother, William Davis, for assault with intent to commit rape and kidnapping. D.C.Code §§ 22–501, –2101 (1989 Repl.) The defense was consent. Appellant testified that on the evening of the incident he returned from the store to find his stepbrother, William Demetrius Hammond, and Michael Lucas talking to the complainant on the front porch of appellant's home. According to appellant, the complainant jumped up when he returned, saying "[t]his is the one I want to talk to," and asked appellant whether she could rent a room from him. Appellant told the complainant that he "didn't have any rooms for her." Appellant testified that, outside of the complainant's hearing, his brother, King Davis, "did offer his room [for the complainant] but I told him that I didn't want to, you know, go through the changes of having a female roomer." Appellant claimed that, despite his explanation that he had no rooms available for rent, the complainant followed appellant when he went into the house and up the stairs. Appellant testi-

1. At one point, a woman knocked on the door and told William to leave. He refused, reclosed the door, and stood by it until appellant told him to go.

fied that the complainant was intoxicated and "in a real happy mood, ... [s]he wants to grab and, you know, this type of thing."

Appellant claimed that when the complainant followed him upstairs, she asked to borrow ten dollars for crack cocaine. When appellant refused, the complainant asked him to sit on the bed with her. She then "threw her legs over [appellant's] and also put her arm around [appellant] and she started talking very intimate." The complainant became upset, however, when they were interrupted by one of appellant's brothers, King Davis, who squirted them with a water pistol. When appellant grabbed and pulled on the complainant, she "snatched" back and then, according to appellant, "a bunch of screaming started and we were tussling. She hit me and she kicked me in my groin area. I grabbed her arm and then ... grabbed her leg." When Derrick Costen and his girlfriend Gwenie came into the room, the complainant "started screaming 'you're trying to rape me.'" Appellant denied that he pulled off any of the complainant's clothes during the scuffle.

After Derrick Costen and Gwenie left the room, the complainant began to cry, and appellant told her that she would have to leave. According to appellant, the complainant then said that she had lost her keys and pocketbook, but appellant remembered that the complainant had not brought a pocketbook with her when she entered the house, so appellant told her to leave. The complainant left the room, but returned to tell appellant that she was going to the police. Appellant testified that he told her "you can go to the police if you want because nothing has happened to you." According to appellant, the complainant then asked to see his room, in the attic of the house, and once inside the room she removed her boots and lay down on appellant's bed. Appellant testified that the complainant "want[ed] to prove to me how she feels about me," and started to remove her clothes. Appellant and the complainant then engaged in sexual intercourse. According to appellant, the complainant told him that "she had a terrible disease at one time," so appellant used a condom. Appellant testified that at approximately 8:45 p.m. he walked the complainant home, and then "didn't see her anymore until she got back with the police."

Michael Lucas testified that the complainant had been drinking and that she "wanted to get high off some [cocaine]." Mr. Lucas claimed that he saw the complainant "grab[ ] [appellant] underneath the arm and [she] was ... directing him to the house going into the front door," and that after he saw them go into the house he and William Demetrius Hammond left for the evening.

Appellant's brother, King Davis, testified that when he heard that the complainant was looking for a room, he told appellant that "he could rent my room out to her." However, appellant told King Davis that "he don't need it because it's just a headache." According to King Davis, the complainant was "leaning on the rail looking in [appellant's] face" during this conversation. King Davis stated that he saw appellant and the complainant go upstairs into his room, and that when he went into the bathroom to put water into his water pistol, he saw "the girl [with] her right leg over George's lap and her right arm around on his shoulders." According to King Davis, the complainant did not get upset when he squirted appellant with his water pistol, but instead, appellant asked him at that time whether he knew where to get some cocaine for the complainant. King Davis testified that he went downstairs for a while, then returned upstairs to find appellant and the complainant still in the same position. According to King Davis, appellant told him "come on man, I'm trying to do something." King Davis replied, "no, man, not here," and appellant and the complainant left his bedroom to go to the attic.

The jury returned a verdict convicting appellant of kidnapping.

## II

▉ Appellant contends that the trial judge failed to instruct the jury adequately on appellant's defense of consent, and that

this failure was substantially prejudicial. Specifically, he maintains that the judge failed to advise the jury that it could acquit appellant even if actual consent was not given as long as the jury found that there were "reasonable grounds" for appellant to believe that the complainant had consented, and that the jury's acquittal of appellant on the charge of assault with intent to rape suggests that consent may have been an important consideration in its verdict.[2] He relies on *Bush v. United States,* 516 A.2d 186, 195 (D.C.1986), also involving a charge of kidnapping, where the court stated that "it would have been more appropriate to have used standard instruction 5.19," and that "the trial court approached the limits of permissible discretion in denying that instruction...." *See* STANDARD JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, (3d ed. 1978).[3] The government acknowledges [at oral argument] that the trial judge did not instruct the jury that it could find that the complainant consented if it found that appellant had reasonable grounds to believe that there was consent.

Thus, the judge omitted the first sentence of Instruction 5.19 that establishes the basis on which the jury is to analyze the evidence in order to determine whether or not the complainant had consented.

The instructions to the jury adequately set forth the general theory of appellant's defense. *See Bush, supra,* 516 A.2d at 194. Because lack of consent is an element of kidnapping, as well as assault with intent to rape, the trial judge gave a special instruction on consent.[4] *See id.* at 194–95; comment to Instruction 5.19. But the judge denied defense counsel's request for Instruction 5.19, and instead only instructed the jury that consent could be express or implied, and could be evidenced by words or actions. Missing is any instruction advising the jury that it could find that there were "reasonable grounds" to believe the complainant had consented.

All of the aspects of Instruction 5.19 that the court specifically mentioned in *Bush, supra,* 516 A.2d at 194, were addressed,[5] in

2. Appellant mistakenly claims that the jury was told that consent was present only where there was actual, objective consent by the complaining witness. Appellant's contention that the instructions presented the danger that he could be convicted without any *mens rea* on his part ignores the instruction to the jury regarding the government's burden of proof with respect to appellant's intent.

3. Standard jury instruction No. 5.19 provides:

> If a person (*insert verb describing defendant's act*) another and the person has consented or there are reasonable grounds to believe that the other has consented, the crime of _____ has not been committed. Consent may be contained in the words or in the actions of the complainant. It may be expressly or impliedly given, and may be evidenced by the action or inaction of the complainant. Where you find that there have been expressions of consent by the complainant, it is for you to determine whether such expressions were given of a free will or were rather the consequence of the complainant being subject to any physical or mental restraint.
>
> Where evidence of consent by the complainant to the actions of the defendant is present, the government must prove beyond a reasonable doubt that the complainant did not consent to such acts. If you find that the government has failed to prove beyond a reasonable doubt that the complainant did not consent to

the defendant's acts, you must find the defendant not guilty.

4. The trial judge instructed the jury that:

> Now, as you know, [appellant] contends that he did not kidnap [the complainant] and did not assault her with the intent of committing rape, but that she consented to everything that happened on October 16, 1989.
>
> Consent may be expressed [sic] or implied and it may be evidenced by words or actions. With respect to both kidnapping and assault with intent to rape, the Government must prove beyond a reasonable doubt that the actions were against the will of the complainant and that she did not voluntarily consent to them.

In addition, in the kidnapping instruction, the jury was told that "it is essential to the proof" for the government to prove beyond a reasonable doubt that appellant must:

> have seized or detained the complainant by use of coercion and that if the complainant submitted to such seizure or detention, she did so involuntarily. Coercion must be done with specific intent to confine the victim and may be achieved by mental as well as physical means.

5. In *Bush, supra,* the court stated:

> The [standard instruction 5.19] would have informed the jury that consent may be express or implied, either by action or inaction, and would have reminded the jury that the

that the jury was instructed that the government had to prove beyond a reasonable doubt that appellant used coercion to seize and detain the complainant against her will and involuntarily.[6] The language about express and implied conduct cannot be viewed, however, as stating in alternative language the instruction that the jury could find consent based on a defendant's reasonable perception of the complainant's actions or inactions. While consent could be express, because the complainant actually consented or her conduct could reasonably be viewed, from her perspective, as indicating consent, there was nothing in the instruction to indicate that consent could also be found from the perspective of a reasonable person under the circumstances, *i.e.*, based on reasonable grounds to believe consent had been given based on the complainant's actions. *See* Standard Jury Instruction No. 5.19. Indeed, a review of the record fails to suggest a good reason not to have given instruction 5.19, including the first sentence. Thus, the question is whether, in view of the factual dispute and credibility contest regarding the complainant's actions in the instant case, the instructional omission is significant.

The government maintains that the disparate versions of events presented by the complainant and the defense—the complainant denying that she consented to anything other than her initial entry into the house and appellant claiming that she alternately grovelled for attention and lashed out, accusing appellant of trying to rape her—forced the jury to determine credibility and not the reasonableness of appellant's interpretation of the complainant's actions and words. Consequently, the government argues that the failure to give that precise instruction is not fatal because

the instructions in their entirety "sufficiently covered the legal principles" raised by appellant's defense that the complainant consented to the assault. *See DiGiovanni v. United States,* 580 A.2d 123, 126 (D.C. 1990); *Sloan v. United States,* 527 A.2d 1277, 1282 (D.C.1986).

The evidence presented in the instant case that would support a theory of consent was considerably weaker than that presented in *Bush.* The defense theory in *Bush* was that the two alleged kidnap victims had not been held against their will, but that they instead were seeking to avoid having to testify in the trial of one of the *Bush* defendants for a previously committed armed robbery and other offenses. 516 A.2d at 193. There was considerable evidence to support such a theory; one of the women testified that she had had a friend put a scratch on her back so that she could go to the hospital on the day the trial was scheduled to begin, and the other woman testified that during the detention she engaged in consensual sexual relations with appellant Bush, who was holding the women in a motel room, and that she had an opportunity to leave the motel room but did not do so. *Id.* There was also evidence that both women voluntarily used illegal drugs with Bush on at least one occasion during their detention, and that both women had been Bush's girlfriends in the past. *Id.* Further, there was evidence that both women considered Browner, the defendant in whose trial the defense claimed the women were seeking to avoid testifying, to be a friend. *Id.*

Despite this evidence, the trial judge in *Bush* refused a defense request to give Criminal Jury Instruction 5.19.[7] On ap-

---

government had the burden of proving the absence of consent beyond a reasonable doubt.
516 A.2d at 194.

**6.** In addition to the instruction on consent, *see supra* n. 4, the trial judge read Instruction No. 4.90 on kidnapping which provides in part:

[t]he word 'kidnap' as used in this offense means forcibly and unlawfully to abduct or steal or carry away a person and detain or keep or confine him [or her] against his [or

her] will. * * * It is essential to the proof of the offense of kidnaping that the defendant have seized or detained the complainant by use of coercion, and that if the complainant submitted to such seizure or detention, he [or she] did so involuntarily.
STANDARD JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, (3d ed. 1978).

**7.** Instead, the judge instructed the jury, *inter alia,* that "[i]t is essential to the proof that the Defendant have seized or detained the Complainant by the use of coercion; and that if the

peal, the court, relying in part on the decisions in *United States v. Fritz*, 580 F.2d 370, 378 (10th Cir.1978) (en banc), and *United States v. Herron*, 551 F.2d 1073, 1075 (6th Cir.1977),[8] concluded that "[w]hile ... it would have been more appropriate to have used standard instruction 5.19, and ... the trial court approached the limits of permissible discretion in denying that instruction, we decline to hold that the trial court went beyond the limits in this case." 516 A.2d at 195. Although the court "hasten[ed] to add that, in circumstances not too much different from those prevailing here, a different view might be taken of [the trial court's] exercise of discretion," *id.*, this is not such a case.

"A defendant is entitled to an instruction on his theory of the case, but he is not entitled to dictate the wording of that instruction." *Fludd v. United States*, 336 A.2d 539, 541 n. 3 (D.C.1975). Appellant testified that the complainant followed him, uninvited, into his house and upstairs to a bedroom, that she refused to leave the house when appellant expressly told her to do so, that the complainant asked to see the attic bedroom, and that she told appellant that she wanted to "prove how she feels about [him]." Thus, appellant's theory of the case was that the complainant initiated her entry into appellant's house, expressly consented to remain in the house, and that the complainant made explicit sexual overtures to appellant while inside the house. While such evidence could constitute a theory that appellant had "reasonable grounds to believe" that the complainant voluntarily remained in the house with him, the trial judge's instruction that "consent may be express or implied, and it may be evidenced by words or actions" is equally appropriate on these facts.

In *Bush*, the court held that the trial judge's decision to give a far less detailed consent instruction than that given in the instant case was "within the range of permissible alternatives." *Id.* 516 A.2d at 195 (quoting *Johnson v. United States*, 398 A.2d 354, 365 (D.C.1979)). Here, although the evidence that would support a consent theory was much weaker than that in *Bush*, the trial judge nevertheless protected appellant Davis' right to a consent instruction by making it clear to the jury that the government had to prove beyond a reasonable doubt that the complainant did not consent to appellant's acts. Accordingly, we hold that the trial judge did not abuse his discretion by declining to give Instruction 5.19. *Johnson, supra*, 398 A.2d at 365.

### III

Appellant also contends that there was insufficient evidence of kidnapping. He maintains that kidnapping requires a "purpose," that the alleged "purpose" in the instant case was attempted rape, and that by acquitting appellant of attempted rape "the jury found that the purpose did not exist [and t]herefore, a kidnapping did not exist." The government responds that it is

Complainant submitted to such a seizure or detention, that she did so involuntarily." 516 A.2d at 194.

8. In *Fritz, supra*, 580 F.2d 370, a prison escapee had been convicted of kidnapping a teenage boy and forcing the boy to drive him from Kansas to Iowa. Fritz had in his possession a hay bale hook, an axe and a baseball bat; the complainant testified that he was "scared" even though he had not been directly threatened with the weapons. Although the complainant had several opportunities to escape, he made no attempt to do so. The Tenth Circuit Court of Appeals upheld the trial judge's instruction on consent, which stated:

Involuntariness or coercion in connection with a victim's seizure and detention is an essential element of the crime charged; it

must also be done with a willful intent to confine the victim's freedom of movement and it may be achieved by mental, as well as physical, means.

580 F.2d at 378. In *Herron, supra*, the Sixth Circuit Court of Appeals held that the trial judge's instructions on consent, which were identical to those given in *Fritz, supra*, were sufficient to inform the jury that it could not convict the defendant if the jury believed his defense that the prison guard he was accused of kidnapping had been bribed by the defendant to allow the defendant to escape, and thus that the kidnapping incident was merely a ruse. 551 F.2d at 1075.

The *Bush* court specifically noted that both of these cases involved "significantly weaker" consent defenses than that presented in *Bush*. We nevertheless find these decisions instructive on the consent issue.

entitled, in view of appellant's acquittal of assault with intent to rape, to have the entire period in which the complainant was detained considered as part of the evidence of kidnapping. Thus, it argues that the evidence of kidnapping consisted of appellant's inveigling the complainant into his house and upstairs into a bedroom on the false pretense that he had a good faith intention to rent her a room.[9] Further, the government continues, the evidence that once in the room, appellant refused to let the complainant leave, and that when she refused to take off her clothes, he called for help from his brother, William, and the two of them then proceeded to take off the complainant's clothes, went "far beyond" what was necessary to accomplish the assault and thus constituted evidence of a kidnapping apart from the assault with intent to commit rape.

■ To prove a kidnapping, the government must show that the defendant confined the complainant with specific intent to detain the complainant for "ransom or reward or otherwise" and that such deten-

tion was involuntary or by use of coercion; the detention may be for any purpose that the defendant believes might benefit him. *See* D.C.Code § 22–2101; *see also* note 6, *supra.* Viewing the evidence, as we must, in the light most favorable to the government, *Beatty v. United States*, 544 A.2d 699, 701 (D.C.1988), and recognizing that the credibility of witnesses is for the jury to determine, *see Wooten v. United States*, 343 A.2d 281, 282 (D.C.1979), the fact that there were weaknesses in the complainant's testimony did not mean that the government's evidence was insufficient.[10] The complainant testified that once she was in a room in appellant's house, appellant blocked her departure and told her that she could not leave. She also testified that when she refused to undress, appellant called his brother to help him forcibly undress her. She further claimed that she physically struggled with appellant and begged him to leave her alone. *See Glascoe v. United States*, 514 A.2d 455, 458 (D.C.1986) (specific intent inferred from de-

**9.** The government bases this argument on the evidence that although appellant told the complainant that she could rent a room from his sister, appellant's sisters did not live in the Davis home. Appellant also did not tell the complainant that he would not rent a room to a woman, although he testified that he had made such a statement to his brother, King Davis, out of the hearing of the complainant. The complainant never testified that she heard appellant say anything to suggest that he was not serious about having a room to rent. We need not decide whether this evidence shows forcible enticement.

The trial judge stated, during the discussion of instructions to the jury, that:

I'm also going to omit—although kidnapping can be charged under our law by decoying or inveigling someone into a detention that's not what was charged in this indictment and therefore, it may not be argued by the Government as your theory and, indeed in your opening statement you disclaimed any such theory and therefore, the only definitions I'm going to give them are the forcible detention definition of kidnapping.

**10.** Defense counsel elicited, on cross examination of the complainant, that she had claimed on the night of the incident that three men were involved but had later claimed that only appellant and his brother William were involved. Even so, the jury could reasonably have found

that the inconsistency was the result of her hysteria on the night of the offenses. That she did not also implicate appellant's younger brother suggests that, contrary to appellant's contention, the complainant was not willing to lie. She explained at trial that the following day she had corrected her statement about how many men were involved to the prosecutor.

The complainant also admitted that she had told the police on the night of the offense that she had been dragged into appellant's house, but had told the prosecutor that this was not how she came to be inside of the house. She explained that she had said this because she "didn't know how to tell anyone that [she] was stupid enough to just walk in that house on [her] own." Again, it was for the jury to consider her credibility in accusing appellant, and the defense could properly exploit, as it did, the complainant's mistaken accusation of a third man and her original claim about a forcible entry as well as her admission that she had been drinking earlier in the evening.

Nor was the suggestion of misidentification of William Davis, based on William Davis' teeth, fatal since the defense expert admitted that Davis' bridge could have been replaced without his (the expert's) detecting it; further, his gold tooth could have been mistaken for bad teeth, as the complainant suggested. These apparent defects in the government's evidence did not make the evidence insufficient nor the complainant incredible.

fendant's conduct). Appellant's own testimony, about the "tussling and pulling and yanking and hitting and slinging" he engaged in with the complainant corroborated the complainant's testimony about the assault. Accordingly, this is not a case in which the complainant's testimony was incredible. *See Ferrar v. United States*, 107 U.S.App.D.C. 204, 275 F.2d 868 (1959).

■ Although, as appellant argues, the evidence of detention was directly related to, and part of, the detention necessarily involved in carrying out the assault, this is not a case in which the charges were duplicitous. The indictment charged appellant with kidnapping "with intent to hold and detain [the complainant]." The assault charge required, in addition, that the government prove the defendant's specific intent to rape. Under these circumstances, there is nothing to prohibit the government from charging both offenses, with the kidnapping charge surviving when there is an acquittal on the charge of assault with intent to rape. Since the jury acquitted appellant of the assault charge, there is no issue of merger presented, and hence our decisions interpreting the kidnapping statute for purposes of merger analysis are inapposite.[11] *See Byrd v. United States*, 510 A.2d 1035, 1037 (D.C.1986) (en banc).

Nor can the fact of inconsistent verdicts defeat the government's claim of evidentiary sufficiency. *See Steadman v. United States*, 358 A.2d 329, 332 (D.C.1976).

■ Accordingly, we affirm the judgment.[12]

FERREN, Associate Judge, dissenting and concurring in part:

This case presents important "instructional" and "sufficiency" issues.

I

The majority opinion implicitly acknowledges that appellant was entitled to an instruction that the jury should acquit if there were " 'reasonable grounds' for appellant to believe that the complainant had consented." [1] *Ante* at 909; *see id.* at 909–910, 911. The majority also concedes that the "language about express and implied conduct" contained in the trial court's instructions "cannot be viewed ... as stating in alternative language the instruction that the jury could find consent based on a defendant's reasonable perception of the complainant's actions or inactions." *Id.* at 910. Later, however, in finding insufficient prejudice for an abuse of discretion, the majority concludes that "the trial

11. Thus, appellant's reliance on *Vines v. United States*, 540 A.2d 1107 (D.C.1988), and *(Julius) Robinson v. United States*, 501 A.2d 1273 (D.C. 1985), is misplaced. In *Vines, supra*, the court held that a momentary detention that was coextensive in time and place with an armed robbery, during which the defendant ordered the victims into one nearby room and later put one of the victims in another room, was insufficient to prove kidnapping. 540 A.2d at 1109. By contrast, in *(Julius) Robinson, supra*, the court held that where the defendant drove the victim for three miles over a fifteen minute period and then sexually assaulted her, the movement and detention of the victim was more than merely incidental to the assault. 501 A.2d at 1277. There was clearly no such movement in the instant case and, as in *Vines, supra*, the detention of the complainant was designed to accomplish the assault in the bedroom. But the issue in these cases, and in *Sinclair v. United States*, 388 A.2d 1201, 1207 (D.C.1978), arose in the context of determining whether the defendant could receive additional punishment as a result of conviction of both kidnapping and the under-

lying offense; that issue is absent in the instant case.

12. Appellant also assigns as error the denial of his motion for a mistrial after a key defense witness (Michael Lucas) was improperly impeached. While the witness was properly impeached with his prior drug convictions, the government concedes that the prosecutor's final question to the witness—"You just sell it" (referring to illegal drugs)—was improper. In view of the trial court's rebuke of the prosecutor in front of the jury ("that's a completely improper questions" [sic] ), and following a bench conference, his striking of the question and answer, and giving of a curative instruction on the "very limited purpose" of the proper impeachment evidence, we conclude, under the circumstances, that the denial of the mistrial was not error. *See Lee v. United States*, 562 A.2d 1202, 1204 (D.C.1989); *Christian v. United States*, 394 A.2d 1, 23 (D.C.1978), *cert. denied*, 442 U.S. 1127, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1973).

1. *See* Standard Jury Instructions for the District of Columbia No. 5.19 (3d ed. 1978), *ante* note 3.

judge's instruction that 'consent may be express or implied, and it may be evidenced by words or actions,' is equally appropriate on these facts." *Id.* at 911. I cannot agree.

The question whether the complainant gave express or implied consent focuses on whether the complainant in fact consented to the acts constituting the kidnapping; the question whether there were reasonable grounds to believe the complainant had consented focuses on the defendant's perception. Appellant's theory of the case—that the complainant consented—was based on what he was reasonably entitled to believe from the evidence of the complainant's actions and words, requiring the jury to make an objective assessment of the evidence in determining the reasonableness of appellant's perception. That is quite different from a jury's assessment of whether appellant established consent in fact, an inquiry necessarily focusing on the complainant's perspective derived from the complainant's express or implied conduct. In short, appellant's theory focuses on his own *reasonable perception* of the complainant's consent; the trial court's jury instruction focuses on the *actuality* of the complainant's consent. The difference is substantial and not merely a difference in wording, as the majority believes.

This fundamental distinction has led the majority of the division to agree—at least implicitly—that the trial court erred in omitting the first sentence of standard instruction 5.19.[2] *See ante* at 910 ("Thus, the question is whether, in view of the factual dispute and credibility contest regarding the complainant's actions in the instant case, the instructional omission is significant."). I believe this error was of a magnitude requiring reversal and thus, on this record, was an abuse of discretion. *See Johnson v. United States,* 398 A.2d 354, 366–67 (D.C.1979). Specifically, appellant presented evidence to support a defense that he had "reasonable grounds to believe" the complainant had consented. He then requested the instruction. A fundamental principle in the criminal law is

that "[a] defendant in a criminal case is entitled to a jury instruction on any issue fairly raised by the evidence ... however weak that evidence may be." *Carter v. United States,* 531 A.2d 956, 959 (D.C. 1987) (citing cases; quotation omitted). Moreover, our decision in *Bush v. United States,* 516 A.2d 186, 193–95 (D.C.1986), in effect told the trial court to give this requested consent instruction where there is a consent defense to the charge of kidnapping while armed. On the facts here, the consent issue was a close one, and the jury could well have come out differently if instructed to focus on the reasonableness of the defendant-appellant's perception that the complainant had consented, not exclusively on whether the complainant had in fact expressly or impliedly consented. Accordingly, I would reverse and remand for a new trial.

## II

I agree with the majority's conclusion about the sufficiency of the evidence of kidnapping and thus would not reverse outright on that claim. But the issue is not an easy one.

Because the trial court ruled (and the government does not contest) that the period during which appellant inveigled the complainant into his house could not be counted as part of the period of the alleged kidnapping, *see ante* at note 9, we consider a situation in which the period of the alleged kidnapping is coextensive with the period of the alleged assault with intent to rape. If the jury had convicted on both, then under our caselaw there would have been a merger and we would have vacated the sentence for kidnapping. *See Vines v. United States,* 540 A.2d 1107, 1109 (D.C. 1988) (where detention constituting kidnapping was coextensive with crime of armed robbery, conviction for kidnapping merged); *(Thomas) Robinson v. United States,* 388 A.2d 1210, 1212–13 (D.C.1978) (where seizure and asportation constituting kidnapping were coextensive with assault with intent to rape, conviction for kidnap-

**2.** *See supra* note 1; *ante* note 3.

ping merged). *Compare (Julius) Robinson v. United States*, 501 A.2d 1273, 1277 (D.C.1985) (where act of kidnapping was completed before attempted sexual assault, no merger); *Sinclair v. United States*, 388 A.2d 1201, 1207–08 (D.C.1978) (where act of kidnapping began before and continued after robbery, no merger). Indeed, this court has stated that "the legislature [did not intend] the [kidnapping] statute to encompass and to punish as two separate crimes" a defendant's actions constituting a kidnapping that are coextensive with his or her acts which constitute a second offense such as robbery or rape. *(Thomas) Robinson*, 388 A.2d at 1213. In such cases, "the trial judge err[s] in submitting the kidnaping issue to the jury." *Id.*

This case, however, does not present a merger problem because the jury acquitted as to assault with intent to rape. This leaves the interesting question whether the kidnapping conviction alone can stand when it would not have survived if coupled with a conviction on the assault charge.

There is a paradox here, to say the least, because the consequence of acquittal on the assault charge left room for the trial court to impose a much lengthier sentence for kidnapping than would have been available in the event of convictions as to both, followed by merger of kidnapping into assault. *Compare* D.C.Code § 22–501 (1989) ("Every person convicted of any assault with intent ... to commit rape ... shall be sentenced to imprisonment for not less than 2 years or more than 15 years.") *with id.* at § 22–2101 ("Whoever shall be guilty of [kidnapping] shall, upon conviction thereof, be punished by imprisonment for

life or for such term as the court in its discretion may determine."). Nonetheless, as I read the kidnapping statute,[3] the government could have properly charged kidnapping alone on these facts, and the evidence would have been sufficient to convict. The statutory language defining the elements of kidnapping covers seizing and detaining for any unlawful purpose; the statute is not limited to the traditional ransom situation.

One could argue that, on facts such as these, a legislature would not have intended to permit a kidnapping prosecution in a predominantly assault with intent to rape situation. *See (Thomas) Robinson*, 388 A.2d at 1213. But, given the plain language of the statute, I find no basis for ascribing that limiting intention to the legislature when, as here, the kidnapping did not merge into the coextensive offense because the jury acquitted on the latter charge. Indeed, on the facts of this case, given the serious question whether the complainant consented to the encounter, one can understand why a jury—instructed as to both charged offenses—may have simply decided to convict on one without realizing that its choice of kidnapping could have resulted in more severe punishment than if it had convicted on the assault with intent to rape charge.[4]

**3.** The kidnapping statute, D.C.Code § 22–2101 (1989), provides in full:

Whoever shall be guilty of, or of aiding or abetting in, seizing, confining, inveigling, enticing, decoying, kidnaping, abducting, concealing, or carrying away any individual by any means whatsoever, and holding or detaining, or with the intent to hold or detain, such individual for ransom or reward or otherwise, except, in the case of a minor, by a parent thereof, shall, upon conviction thereof, be punished by imprisonment for life or for such term as the court in its discretion may determine. This section shall be held to have been violated if either the seizing, confining, invei-

gling, enticing, decoying, kidnaping, abducting, concealing, carrying away, holding, or detaining occurs in the District of Columbia. If 2 or more individuals enter into any agreement or conspiracy to do any act or acts which would constitute a violation of the provisions of this section, and 1 or more of such individuals do any act to effect the object of such agreement or conspiracy, each such individual shall be deemed to have violated the provisions of this section.

**4.** In this case, appellant was sentenced to imprisonment for a term of three to fifteen years, less than the life sentence the kidnapping statute allows.